790 P.2d 347

Irvin WIEMER, Plaintiff-Appellant,

v.

Ronald D. RANKIN, aka Ron Rankin and Alice Rankin, husband and wife, Defendants-Respondents.

No. 17268.

Supreme Court of Idaho.

April 4, 1990.

---

Cox, Davis & Stoddard, Coeur d'Alene, Idaho, for plaintiff-appellant. J. Ray Cox, Jr., argued.

Paine, Hamblen, Coffin, Brooke & Miller, Spokane, Wash., for defendants-respondents. Sylvia L. Glover, argued.

JOHNSON, Justice.

This is a defamation action by Irvin Wiemer against Ronald Rankin and Rankin's wife. The action is based on a newspaper article published by Rankin indicating that Irvin had lied when he told the police that his wife, Debbie, committed suicide. The trial court granted summary

judgment dismissing the complaint. The issues presented are: (1) whether the trial court properly placed the burden on Irvin to prove that Rankin's statements about Debbie's death were false, (2) whether there was a genuine issue as to the falsity of Rankin's statements and (3) whether Rankin had a qualified privilege to publish the statements under either state law or the First Amendment. We hold:

1. Irvin had the burden to prove the falsity of the statements.

2. There was a genuine issue as to whether the statements were false.

3. Rankin did not have a qualified privilege to publish the statements under I.C. § 6–713.

4. Irvin may recover damages for actual injury without proving actual malice on the part of Rankin.

5. The trial court correctly dismissed Irvin's claim as it related to presumed or punitive damages, because the evidence did not raise a genuine issue of fact that Rankin had actual malice in writing the portion of the article that dealt with Debbie's death.

We affirm the summary judgment as it relates to presumed or punitive damages, reverse the summary judgment as it relates to damages for actual injury and remand the case to the trial court for further proceedings.

## I.

## THE BACKGROUND AND PRIOR PROCEEDINGS.

In 1980 Irvin's wife, Debbie, died in Post Falls of a gunshot wound to the chest. Her death occurred in the home where Irvin and Debbie lived with their children. Irvin told the investigating officers that Debbie had shot herself because she was upset about family matters. Although there was some suspicion that Irvin was responsible for Debbie's death, he was not prosecuted.

In 1986 Ronald Rankin published an article about the prosecutor of Kootenai County in a free tabloid newspaper he occasionally distributed in northern Idaho. The article charged the prosecutor with being inept, indifferent or incompetent. Among other things the article called for a coroner's inquest into Debbie's death. The article contained this comment on the handling of the case:

One case, however, which will not disappear for lack of prosecution concerns the death of a 23 year old mother of two, Debbie Wiemer in Post Falls on Saturday, January 11, 1980. Mrs. Wiemer was shot in the chest at point blank range with a 44 Magnum revolver, at about midnight. The Post Falls police responded to the call and Detective Randy Bohn conducted the investigation. At about 1:30 A.M., Walker and his staff investigator Merv Stalder (now Kootenai County Sheriff) arrived. Stalder interviewed the husband of the victim and observed the scene. *The husband stated that his wife shot herself.* Walker and Stalder left the scene at approximately 2 A.M., with Walker telling Det. Bohn that they would be in touch with him on Monday and decide where the autopsy would be conducted. When Bohn, continuing his investigation, contacted the victim's family on Sunday afternoon, he was informed that an autopsy had already been performed that morning at 10 A.M. On Wednesday, Bohn was informed by the family that the body had been released and cremated. *The evidence collected by the Post Falls Police Department and by Det. Bohn indic[a]ting that the victim did not shoot herself—and which I have personally viewed—is overwhelming.* It contains photographs indicating that it was impossible for the victim to have held the gun in the position needed to shoot herself; a laboratory chemical test by the FBI which found no antimony barium from the gun discharge on the hand swabs taken of the victim; lint on the gun indicating it had been wiped clean of fingerprints; a severe wound to the victim's mouth, which Stalder's report confirmed appeared to have come from a blow; and boxes of the victim's clothing and personal effects which had been packed indicating an intent to leave

home.... and more. The thoroughness of the Post Falls police investigation is irrefutable. Bohn, who is now assistant police chief in Post Falls, has personally taken the files of the case to the prosecutor's office at least once a year since the incident. He states that each time the files are presented, the current deputy prosecutor has agreed to the merit of the case. Each time the deputy has said he would discuss the case with Walker; each time nothing further was done. (Emphasis added.)

Irvin demanded a retraction of this portion of the article. When Rankin did not retract the statements, Irvin brought this action, seeking general and exemplary damages for defamation. The complaint alleged that in the portion of the article referring to Debbie's death Rankin meant and intended to mean that Irvin was guilty of murdering Debbie, that Irvin lied to authorities when he stated to them that Debbie had shot herself and that Rankin had reviewed irrefutable evidence of these claimed facts. The complaint also alleged that in the context of the article the portion about Debbie's death was understood by the readers of the newspaper to have this meaning and to indicate that Irvin was the one to which this portion of the article referred.

In his answer Rankin admitted the publication of the article but denied that it defamed Irvin. Rankin asserted that the article was privileged, was truthful, was fair comment and the report of a newsworthy event and reported communications and other publications made in the course of official duties and/or reported matters of public record. He also pleaded as a defense that the complaint failed to allege malice.

After the depositions of Irvin and Rankin had been taken, Rankin moved for summary judgment based on Irvin's deposition and affidavits of Rankin, his attorney, the investigating detective and another local journalist. Rankin asserted that he was entitled to summary judgment because: (1) he had a qualified privilege to publish the results of a police investigation and to rely on police reports and the investigations and

conclusions of police officers and (2) a matter of public concern was involved, requiring Irvin to prove the falsity of the statements. Rankin contended that Irvin was unable to identify a false statement of fact that defamed him.

In ruling on the motion for summary judgment, the trial court noted that Irvin did not dispute any of the material facts in the portion of the article relating to Debbie's death. The trial court concluded that Rankin was stating his opinion, and not fact, when he wrote that he had personally viewed the evidence collected by the police and that the evidence indicated overwhelmingly that Debbie had not shot herself. The trial court also concluded that Rankin's statements based on the police reports were a privileged publication of a "public official proceeding" under I.C. § 6–713 (1979).

The trial court ruled:

1. Although Irvin was a private figure, the investigation of Debbie's death was a matter of public concern.

2. Irvin had the burden of proving that the allegedly defamatory statements were false and that he had not done so.

3. There was no evidence showing with convincing clarity that Rankin acted with actual malice toward Irvin in publishing the article.

4. The article on its face was not defamatory of Irvin.

Irvin's attorney moved for reconsideration of the trial court's decision, contending, among other things, that the trial court should have considered the deposition of the detective, which was taken before the trial court's decision was issued, but not considered by the trial court. The trial court denied the motion and entered summary judgment dismissing the complaint. Irvin has appealed from the judgment.

II.

IRVIN HAD THE BURDEN OF PROVING THAT RANKIN'S STATEMENTS WERE FALSE.

This case causes us to explore the correct relationship between the law of defamation

in Idaho and freedom of the press under the First Amendment. In doing so we must first determine whether Rankin had the burden of proving the truth of the statements about Debbie's death or whether Irvin had the burden of proving that the statements were false.

 A statement imputing that a person is guilty of a serious crime such as homicide is defamatory per se. *Barlow v. International Harvester Co.*, 95 Idaho 881, 890, 522 P.2d 1102, 1111 (1974). Liberally construing the facts and drawing all reasonable inferences in Irvin's favor, as we must in a summary judgment proceeding, we interpret the article as imputing not only that Irvin lied about Debbie's committing suicide, but also that he killed Debbie. *Doe v. Durtschi*, 110 Idaho 466, 469–70, 716 P.2d 1238, 1241–42 (1986). Ordinarily, the truth of a defamatory statement is a defense that must be proved by the defendant. *Baker v. Burlington Northern, Inc.*, 99 Idaho 688, 690, 587 P.2d 829, 831 (1978). However, even when the person alleging defamation is a private figure, where a newspaper article containing the alleged defamation discusses a matter of public concern, "the common law's rule on falsity—that the defendant must bear the burden of proving truth—must ... fall ... to a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages." *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776, 106 S.Ct. 1558, 1563, 89 L.Ed.2d 783, 792 (1986).

 Under the most recent tests announced by the United States Supreme Court, Irvin was a private figure. One test used to determine if a person is a public figure is whether the person occupies "a position of such 'persuasive power and influence' that he could be deemed one of that small group of individuals who are public figures for all purposes." *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 165, 99 S.Ct. 2701, 2706, 61 L.Ed.2d 450, 458 (1979). Nothing in the record here indicates that Irvin was a person of this type.

A second test to determine if a person is a public figure is whether the person has thrust himself " 'to the forefront of particular public controversies in order to influence the resolution of the issues involved.' " *Id.* at 165, 99 S.Ct. at 2706, 61 L.Ed.2d at 459 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789, 808 (1974)). In that circumstance the person would be a public figure for the limited purpose of comment on his connection with, or involvement in, the particular public controversy. Even assuming that there may have been public controversy about Debbie's death and the failure to prosecute Irvin for homicide, there is no indication in the record here that Irvin thrust himself to the forefront to influence the resolution of the issues involved. As the Supreme Court said in *Wolston:* "A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." 443 U.S. at 167, 99 S.Ct. at 2707, 61 L.Ed.2d at 460. There, the Court also rejected the contention "that any person who engages in criminal conduct automatically becomes a public figure for purposes of comment on a limited range of issues relating to his conviction." *Id.* at 168, 99 S.Ct. at 2708, 61 L.Ed.2d at 461. Under these tests the trial court correctly characterized Irvin as a private figure.

The trial court also correctly identified the subject of Rankin's article, including the statements about Debbie's death, to be a matter of public concern. The performance of a public official is at the heart of the subjects covered by the freedom of speech and freedom of the press protections under the First Amendment. *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The Supreme Court has stated that " '[w]hether ... speech addresses a matter of public concern must be determined by [the expression's] content, form, and context ... as revealed by the whole record.' " *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761, 105 S.Ct. 2939, 2946, 86 L.Ed.2d 593, 604 (1985) (quoting *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708, 720

(1983)). The content, form and context of Rankin's statements about Debbie's death indicate that it was a matter of public concern, not just a matter of his own individual interest, as in *Dun & Bradstreet.* The article addressed the performance of the prosecutor and called for a coroner's inquest into Debbie's death. In this context, the statements about Debbie's death and whether she committed suicide were matters of public concern. Therefore, Irvin had the burden of proving that Rankin's statements about Debbie's death were false.

### III.

### THERE WAS A GENUINE ISSUE AS TO THE FALSITY OF RANKIN'S STATEMENTS.

■ Irvin asserts that he disputed facts about Debbie's death presented in Rankin's article. The article included references to overwhelming evidence that Debbie did not shoot herself, to the impossibility of Debbie having held the gun in the position required to shoot herself and to the significance of chemical tests related to the discharge of the gun. Irvin contends that by this part of the article Rankin implied that Debbie did not shoot herself, that Irvin lied during the police investigation and that Irvin murdered Debbie. For purposes of reviewing the award of summary judgment, we interpret the article as implying these statements.

Irvin disagrees with the trial court's characterization of the crucial portions of the article and the implications from them as statements of opinion, not statements of fact. The Supreme Court has distinguished between fact and opinion in the context of the First Amendment protection against liability for defamation:

We begin with the common ground. Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in "uninhibited, robust, and wide-open" debate on public issues. *New York Times Co. v. Sullivan,* 376 U.S., at 270, 84 S.Ct., at 721. They belong to that category of utterances which "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942).

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789, 805 (1974) (footnote omitted); *see also Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988).

The Supreme Court has also noted the difficulty of determining whether a statement is one of fact or opinion. *See Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). One means of differentiating between fact and opinion in this context has been formulated by the Second Circuit:

An assertion that cannot be proved false cannot be held libellous. A writer cannot be sued for simply expressing his opinion of another person, however unreasonable the opinion or vituperous the expressing of it may be. *See Gertz v. Robert Welch, Inc.,* supra, 418 U.S. at 339–40, 94 S.Ct. 2997; *Buckley v. Littell,* [539 F.2d 882, 893 (2d Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977)]....

Liability for libel may attach, however, when a negative characterization of a person is coupled with a clear but false implication that the author is privy to facts about the person that are unknown to the general reader. If an author represents that he has private, first-hand knowledge which substantiates the opinions he expresses, the expression of opinion becomes as damaging as an assertion of fact.

*Hotchner v. Castillo–Puche,* 551 F.2d 910, 913 (2d Cir.), *cert. denied,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977).

We note with interest the doubt that has been cast by legal scholars on the reliability of attempting to distinguish between fact and opinion as a basis for decisions in defamation cases. Titus, *Statement of Fact Versus Statement of Opinion—A Spurious Dispute in Fair Comment,* 15 Vand.L.Rev. 1203 (1962); Note, 62 Harv.L. Rev. 1207 (1949). *But cf.* Post, *The Constitutional Concept of Public Discourse: Outrageous Opinion, Democratic Deliberation, and Hustler Magazine v. Falwell,* 103 Harv.L.Rev. 601, 649–666 (1990). Titus premises his analysis on this proposition:

> The important consideration, then, is not whether the particular statement fits into one category or another, but whether the particular article provided sufficient information upon which the reader could make an independent judgment for himself.

Titus, *supra,* at 1216.

This proposition applies a similar focus to that of the Second Circuit in *Hotchner.* If it were falsely represented or implied that the author had private, first-hand knowledge which substantiated the assertions made, there would not be sufficient information upon which the reader could make an independent judgment. Using this approach to evaluate the implications of Rankin's article gives us a framework within which to determine whether the article expressed or implied defamatory statements of "fact" or protected statements of "opinion."

The crucial portions of Rankin's article that must be evaluated in this manner are:

> The husband stated that his wife shot herself.... The evidence collected by the Post Falls Police Department and by Det. Bohn indic[a]ting that the victim did not shoot herself—and which I have personally viewed—is overwhelming. It contains photographs indicating that it was impossible for the victim to have held the gun in the position needed to shoot herself; a laboratory chemical test by the FBI which found no antimony barium from the gun discharge on the hand swabs taken of the victim; lint on the gun indicating it had been wiped clean of fingerprints; a severe wound to the victim's mouth, which Stalder's report confirmed appeared to have come from a blow; and boxes of the victim's clothing and personal effects which had been packed indicating an intent to leave home ... and more.

Rankin's statements about the FBI test of the gun, the lint on the gun, the wound to Debbie's mouth and the boxes of her clothing and personal effects provide information that would assist the reader in making a decision whether the evidence that Debbie did not shoot herself was overwhelming. The reference to photographs indicating that it was impossible for Debbie to shoot herself is more troubling. Since the photographs are not included in the article, there is insufficient information for a reader to determine whether the photographs support the statement that there was overwhelming evidence that Debbie did not commit suicide. In this context the photos take on the character of the private, first-hand knowledge that was noted in *Hotchner* as being a mark of defamatory opinion. Therefore, we hold that the trial court should not have concluded that Rankin's statement that the evidence was overwhelming was a matter of opinion. Treating the statement as one of fact, we must then determine whether Irvin raised a genuine issue as to its falsity.

In his deposition Rankin admitted that he did not read everything in the police file, including a polygraph examination of Irvin that concluded that he was telling the truth when he said he did not shoot his wife. Rankin also admitted that he had read the FBI report concerning the testing to determine whether Debbie or Irvin had fired the gun. This report stated that it could not be determined whether Debbie or Irvin had discharged the firearm, but that this did not preclude the possibility that either of them could have discharged the gun. Rankin did not include in the article that the test was negative as to Irvin as well as Debbie or that the test was not conclusive.

Liberally construing these facts and drawing all reasonable inferences in Irvin's favor, as we must in a summary judgment proceeding, we conclude that there was a genuine issue of material fact as to the falsity of Rankin's statement that the evidence was overwhelming.

## IV.

### RANKIN DID NOT HAVE A QUALIFIED PRIVILEGE UNDER I.C. § 6–713.

■ Irvin asserts that the trial court was incorrect in concluding that Rankin's article was a fair and true report, without malice, of the proceedings of public officials. We agree.

The trial court concluded that the police reports that Rankin reviewed before writing his article were official records of things said and done by members of the police department and thereby constituted a "public official proceeding" under I.C. § 6–713(4). This statute provides:

**6–713. Privileged publication in newspaper defined.**—A privileged publication in a newspaper which shall not be considered as libelous is one made:

. . . .

(4) By a fair and true report, without malice, of a judicial, legislative or other public official proceeding, or of anything said in the course thereof, or of a charge or complaint made by any person to a public official, upon which a warrant shall have been issued or an arrest made.

We find it necessary to determine whether the police reports here constituted a "public official proceeding." *See Dalton v. Idaho Dairy Prods. Comm'n,* 107 Idaho 6, 684 P.2d 983 (1984); I.C. § 9–335 (Supp. 1989) (enacted in 1986 after the publication at issue here); 7 Op.Att'y Gen. (1986). We conclude that even if the police reports constituted a public official proceeding, the privilege granted by the statute did not apply here, because Rankin admitted in his deposition that in reaching the conclusions that led to the statements he made in the article he relied on statements made to him

by the investigating officer that went beyond the reports. This destroyed any basis Rankin had to claim that the article was based only on a public official proceeding. Rankin argues that the statements made to him by the investigating officer should be construed as part of the public official proceeding. However, these statements were made privately by a law enforcement officer to a newspaper reporter and were not part of the investigation of Debbie's death. Regardless of whether police reports are a public official proceeding, private statements of police officers made to members of the news media are not.

In a very comparable situation, applying a similar statute, the Appellate Division of the New York Supreme Court said: "The narration in private to newspaper reporters by police officers or acts of other persons is not 'a public and official proceeding' coming within the range of the statute." *Kelley v. Hearst Corp.,* 2 A.D.2d 480, 157 N.Y.S.2d 498, 502 (1956); *cf. Law Firm of Daniel P. Foster v. Turner Broadcasting Sys., Inc.,* 844 F.2d 955, 960–61 (2d Cir.), *cert. denied,* 488 U.S. 994, 109 S.Ct. 559, 102 L.Ed.2d 585 (1988).

## V.

### IRVIN WAS REQUIRED TO PROVE ACTUAL MALICE TO RECOVER PRESUMED OR PUNITIVE DAMAGES, BUT NOT TO RECOVER DAMAGES FOR ACTUAL INJURY.

■ The trial court ruled that in order to recover against Rankin, Irvin was required to prove actual malice. We agree as to the recovery of presumed or punitive damages. We disagree as to the recovery of damages for actual injury.

As we have stated above, Irvin was not a public figure. He was a private figure who was the subject of an article involving a matter of public concern. This distinguishes this case from *Bandelin v. Pietsch,* 98 Idaho 337, 563 P.2d 395, *cert. denied,* 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 177 (1977). There, in applying the *New York Times* doctrine, this Court relied on the fact that the plaintiff was a public

figure. The Court specifically distinguished the situation in which a private individual is the subject of a newspaper article involving a matter of public concern:

> In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the tension that necessarily exists between the need for a robust press and the competing societal interest in preserving the integrity of an individual's reputation resulted in a retrenchment of the Court's interpretation of first amendment rights. The battleground was the threshold issue of privilege. The majority in *Gertz* rejected the contention of the plurality in *Rosenbloom* [*v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971)] that publications involving matters of public and general concern enjoyed a constitutional privilege even when they involved private individuals.

98 Idaho at 339, 563 P.2d at 397.

In *Gertz* the Supreme Court said:

> We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual. This approach provides a more equitable boundary between the competing concerns involved here. It recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation, yet shields the press and broadcast media from the rigors of strict liability for defamation....
>
> Our accommodation of the competing values at stake in defamation suits by private individuals allows the States to impose liability on the publisher or broadcaster of defamatory falsehood on a less demanding showing than that required by *New York Times*.... [W]e hold that the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth.
>
> ....

It is necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation for actual injury.... [A]ctual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury.

418 U.S. at 347–50, 94 S.Ct. at 3010–12, 41 L.Ed.2d at 809–11 (footnote omitted).

Under *Gertz*, Irvin was required to prove actual malice in order to recover presumed or punitive damages. However, he would be entitled to recover damages for any actual injury he may have sustained without proving actual malice on Rankin's part. See Idaho Jury Instruction 920, paragraphs 2 and 4 as to the measure of damages for actual injury due to defamation.

## VI.

THE EVIDENCE DID NOT RAISE A GENUINE ISSUE OF FACT THAT RANKIN HAD ACTUAL MALICE.

■ The Supreme Court has announced the standard to be applied in ruling on a motion for summary judgment in a defamation case in which actual malice must be proved:

> When determining if a genuine factual issue as to actual malice exists in a libel suit ... a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times*. For example, there is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence.
>
> Thus, in ruling on a motion for summary judgment, the judge must view the

evidence presented through the prism of the substantive evidentiary burden. This conclusion is mandated by the nature of this determination. The question here is whether a jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of evidence required by the governing law *or* that he did not. Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant: It makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these standards and boundaries are in fact provided by the applicable evidentiary standards.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254–55, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202, 215–16 (1986) (emphasis in original).

The recent decision of the Supreme Court in *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. ——, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989), supports the appropriateness of this standard. In *Harte–Hanks* the Court considered whether there was sufficient evidence in the record to support a jury verdict in favor of a public figure in a defamation action against a newspaper. In upholding the judgment entered on the basis of the verdict, the Court cited *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 510–11, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502, 523 (1984), for the rule that "[t]he question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law." 491 U.S. at ——, 109 S.Ct. at 2694, 105 L.Ed.2d at 587. In explaining the rationale for this rule the Court said:

> This rule is not simply premised on common law tradition, but on the unique character of the interest protected by the actual malice standard. Our profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out an area of " 'breathing space' " so that protected speech is not discouraged. The meaning of terms such as "actual malice"—and, more particularly, "reckless disregard"—however, are not readily captured in "one infallible definition." Rather, only through the course of case-by-case adjudication can we give content to these otherwise elusive constitutional standards.... Most fundamentally, the rule is premised on the recognition that *"[j]udges, as expositors of the Constitution,"* have a duty to *"independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.' "*

491 U.S. at ——, 109 S.Ct. at 2694–95, 105 L.Ed.2d at 587–88 (footnote and citations omitted; emphasis added).

In applying this rule in *Harte–Hanks*, the Court said:

> If a false and defamatory statement is published with knowledge of falsity or a reckless disregard for the truth, the public figure may prevail. A "reckless disregard" for the truth, however, requires more than a departure from reasonably prudent conduct. "There must be sufficient evidence to permit the conclusion that *the defendant in fact entertained serious doubts as to the truth of his publication."* The standard is a subjective one—there must be sufficient evidence to permit the conclusion that *the defendant actually had a "high degree of awareness of ... probable falsity."* As a result, failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard.

491 U.S. at ——, 109 S.Ct. at 2696, 105 L.Ed.2d at 589 (citations omitted; emphasis added).

In *Harte–Hanks* there were several items of evidence in the record that the Court found were sufficient to support the verdict holding the newspaper liable. The Court noted that tapes of an interview with

a key witness were made available to the newspaper, but "no one at the newspaper took the time to listen to them," nor did they make any effort to interview the witness. 491 U.S. at ——, 109 S.Ct. at 2698, 105 L.Ed.2d at 591. The Court said that the jury had determined that the newspaper's explanation for these omissions was not credible and that, therefore, "it is likely that the newspaper's inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the] charges." *Id.* The Court focused on the "purposeful avoidance of the truth" as the critical element in its determination that there was sufficient evidence to support a finding of actual malice. *Id.*

Thus, it is our duty here to decide independently whether there is clear and convincing evidence in the record to support a finding of actual malice on Rankin's part in publishing the statements about Debbie's death. In doing so we must determine whether there is sufficient evidence to permit the conclusion that Rankin in fact entertained serious doubts as to the truth of his statements or that subjectively Rankin had a high degree of awareness of the probable falsity of the statements. Our focus will be on whether the evidence indicated that Rankin purposely avoided the truth.

Here, the trial court ruled: "Even viewing the evidence most favorably to Mr. Wiemer by giving him the benefit of all proper inferences, there is no evidence that shows with *convincing clarity* that Ronald Rankin acted with the requisite malice in publishing the subject article." (Emphasis in original.) We agree. A review of the evidence that was before the trial court on the motion for summary judgment does not indicate, using the words of the Supreme Court in *Harte–Hanks*, that Rankin "entertained serious doubt as to the truth of his publication" or had a " 'high degree of awareness of ... probable falsity' " of what he wrote about Debbie's death. The evidence does not convince us that Rankin purposely avoided the truth.

Wiemer asserts that several items of evidence indicate that Rankin was actually malicious, *i.e.*, knew of the falsity or was in reckless disregard of the truth, in publishing the statements about Debbie's death. Wiemer argues there is circumstantial evidence in the record of Rankin's reckless disregard of the truth in the statements he published about Debbie's death:

1. The photographs in the police records do not indicate that it was impossible for Debbie to have held the gun in the position needed to shoot herself.

2. There was evidence in the police reports indicating that not only were tests made to determine whether there were traces of antimony barium from the discharge of a gun on Debbie's hands but that the same test on Irvin's hands was also negative. The report of the results of these tests indicated that, in any event, they were not conclusive.

3. There was evidence in the police records indicating that a polygraph examination of Wiemer indicated that he was telling the truth.

4. Rankin failed to interview other witnesses concerning their knowledge of the circumstances of Debbie's death.

These contentions must be considered in light of Rankin's deposition testimony about his investigation and the preparation of the article. Concerning the photographs, Rankin testified:

I think probably in the photographs, the one that had the greatest impact on me was the photograph of her arms after the shooting and the location of the—as Detective Bohn explained, when somebody is shot like that, there's a gas return in the blood. And if someone were holding a .44 magnum and fired, they would have to be holding it thusly (indicating) or thusly (indicating) in which case the blood splatters would have been on the inside of the arms. The photographs that Detective Bohn showed me had blood splatters on the outside of the arms that he indicated would have come from somebody who was holding their arms against their chest.

Concerning the antimony barium test, Rankin testified:

> [The FBI report] was about the lack of antimony and barium on her—on her hands that the Detective Bohn felt would have been there had she fired. And I saw the photographs that accompanied that had her hands bagged and tied so that they could take the smears and preserve the chemical balance of her skin at the time.

When he was shown a report of a polygraph examination conducted on Irvin that indicated Irwin was being truthful when he said he did not shoot Debbie, Rankin testified:

> I don't recall seeing that before. Mr. Bohn told me that he had passed one and failed one.

Concerning his failure to interview other witnesses, Rankin testified:

> Conversation was that [Mr. Bohn] didn't think [Debbie] could have killed herself.
>
> ....
>
> [Mr. Bohn] said that he had tried to file it for a homicide a number of times.
>
> ....
>
> There—there was an opinion. There was speculation.... By just about everybody that was aware of this....—Randy Bohn, Chief Steele. That charges should have been filed.... Against the husband.
>
> ....
>
> —[T]he whole file was there. And with Mr. Bohn we had a—Detective Bohn we had a narrative of the sequence of events.... At the conclusion [Bohn] did say that in his opinion that [Debbie], one, had been shot not by herself but that he felt that it was by her husband.... [Chief Steele] indicated that he too thought it was Wiemer.
>
> ....
>
> I felt that the investigating officer that was telling me—this story was in what the investigating officer was telling me that he investigated and the conclusions that were reached.
>
> ....

Well, the reason [I didn't check with outside sources to attempt to verify Mr. Bohn's statements and his opinions] would be because I had seen the photographs and I had seen various documentation that tend to verify what he had told me.

> ....
>
> It was after I had written the story. And I took it by to [Bohn and Steele] to verify that it was factual.... And they said it was factual.

Despite our concerns about the style of Rankin's reporting, we are unable to conclude from the evidence presented to the trial court on the motion for summary judgment that Rankin entertained serious doubts as to the truth of his statements about Debbie's death or that he actually had a high degree of awareness of probable falsity. We also are unable to conclude that Rankin made a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of the charges against Wiemer or that he purposefully avoided the truth. There is no evidence indicating that Rankin should have questioned the credibility of Bohn or Steele. Therefore, we conclude that there was no clear and convincing proof of actual malice.

## VII.

## CONCLUSION.

We affirm the summary judgment granted in favor of Rankin as it relates to presumed or punitive damages. We reverse the summary judgment as it relates to damages for actual injury and remand this case to the trial court for further proceedings consistent with this opinion.

Because of the mixed result, we award no costs to either party. No attorney fees were requested.

BAKES, C.J., and BOYLE and McDEVITT, JJ., concur.

BISTLINE, Justice, concurring in part, dissenting in part.

Although I am generally in agreement with Justice Johnson's opinion, I am not

persuaded to fully concur in Part II, and I dissent from Parts V and VI. I do agree however that case law precedent from the Supreme Court of the United States interpreting the First Amendment guarantees of the United States Constitution requires that the summary judgment entered against plaintiff Irvin Wiemer cannot stand.

Justice Johnson's opinion mentions "actual malice" without providing the legal definition of the term. At 573, 790 P.2d at 354. This term appears to be a main ingredient in defamation cases, and fearing that there may be some confusion of that term with the better known term "malice," as used in ordinary civil cases to denote maliciousness, mischievousness, ill will, or harassment, it is in order to favor the readers of our opinions with a definition. In the *Anderson* case, cited by Justice Johnson, at 574, 790 P.2d at 355, the Supreme Court restated its legal definition of actual malice in this passage:

> In *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964), we held that, in a libel suit brought by a public official, the First Amendment requires the plaintiff to show that in publishing the defamatory statement the defendant acted with actual malice—*'with knowledge that it was false or with reckless disregard of whether it was false or not.'* We held further that such actual malice must be shown with 'convincing clarity.' *Id.,* at 285–286, 84 S.Ct., at 729.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 244, 106 S.Ct. 2505, 2508, 91 L.Ed.2d 202 (1986) (emphasis added).

Justice Johnson has correctly concluded that Mr. Wiemer is not a public figure, yet, purporting to rely on *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), he states that Wiemer must prove actual malice in order to recover "presumed or punitive damages." At 574, 790 P.2d at 355. This would be a correct statement if Wiemer's action had been tried, Wiemer had been awarded presumed damages, and if Rankin were challenging that award. *Harte–Hanks Com-*

*munications, Inc. v. Connaughton,* 491 U.S. ——, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) makes that proposition abundantly clear. Equally clear, *Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), teaches that the issue of actual malice brings into play the defendant's state of mind, the resolution of which is not readily subject to being made in summary judgment proceedings where, as an important concern, a defendant's credibility is not open to assessment by the trier of fact, whereas it would be at trial. This proposition will be further addressed *infra.* But, at the very outset, contrary to the views of Justice Johnson, Mr. Wiemer was not obliged to *prove* anything in resisting a motion for summary judgment. It is not seen how any legally trained mind could become convinced that the defendant *as a matter of law is entitled to summary judgment,* resulting in the removal of presumed or punitive damages from further litigation, on the sole basis that the death of Mrs. Wiemer was a matter of public concern, or that there is not a sufficient showing of actual malice, which is the applicable rule. Definitely this is an issue which guiding case law precedent requires should be presented to a jury for resolution.

The plaintiff's action in this case is based on the precise language of the Supreme Court's definition of actual malice, and the allegation is that the defendant published the article either knowing of its falsity, or with reckless disregard of whether it was or was not false. Justice Johnson has found that the article contained false statements, and the other justices have agreed with this conclusion. Unlike many of the reported cases, such as *Gertz,* for example, where the defendant was a publisher of *American Opinion* and the libellous article was not authored by the publisher, but rather by a commissioned contributor, in the case before us the publisher and author are all one and the same, namely Ron Rankin. Under that scenario Mr. Rankin can point only to himself as the person responsible for any false statements, or half-truths, or innuendos which appear in his article. The plaintiff has presented a suffi-

cient showing of either presumable knowledge of falsity, or of reckless disregard, to create a triable issue. The defendant may still be able to maintain at trial that he did not know of the falsity of the statements which he made. But that is not the end of all inquiry. A factual determination which would properly be made at trial is whether or not the article was published with knowledge of its falsity or with *reckless disregard.*

The issue of whether the defendant knew of the article's falsity, or was guilty of reckless disregard, is an inquiry into the defendant's *state of mind.* This inquiry is properly made by the jury, and not by trial judges through summary judgment proceedings, and especially, as here, not by appellate judges when reviewing district court grants of summary judgments. At summary judgment proceedings the plaintiff need not prove his case, but only needs to sufficiently establish his entitlement to a jury trial.

The district court's opinion in the grant of summary judgment did make the statement that "even viewing the evidence most favorably to Mr. Wiemer by giving him the benefit of all proper inferences, there is no evidence that shows with *convincing clarity* that Ronald Rankin acted with requisite malice in publishing the subject article." But the district court went on to explain that conclusion:

> Most libel cases involving newspapers deal with critical articles directly focusing upon the plaintiff. In our present case, the thrust of the entire article published by Ronald Rankin was to publicly criticize and comment on Glen Walker's performance in office as the Kootenai County Prosecuting Attorney. Mr. Wiemer was a person related by marriage to Deborah Wiemer, who met a violent death. This Court *was* concerned by the 'ricochet' effect which Mr. Rankin's article had upon Irvin Wiemer. No judicial opinions could be found dealing

directly with such an unusual circumstance. However, this Court is convinced the malice required to pursue this action must be directed to the plaintiff herein.[1]

The district court, I fear, had a better grasp of the unusual circumstance than do the justices who constitute a majority. The district court clearly understood that Rankin's article was directed at Walker, who has not sued Rankin, and that the libelling of Mr. Wiemer was simply a by-product of Rankin's attack on Mr. Walker. There is no reason to doubt what Mr. Rankin could truthfully say that he bore Mr. Wiemer no ill will. And, of course, on the standard definition of malice, Mr. Rankin could not be accused of prefabrication. However, our concern is with the hereinabove stated definition of the "actual malice" which applies to defamation actions.

The ultimate conclusion of the district court which supplied the basis for the above finding of "no evidence that shows with convincing clarity" was the district court's view that "as a private figure embroiled in a matter of public concern, Mr. Wiemer bears that burden of proving the alleged defamatory statements were false.... The question involving falsity of the published material is not appropriate for the jury to consider inasmuch as Mr. Wiemer acknowledged its factual truth in his deposition." R., 216–17.

The district court's grant of summary judgment is therefore based upon the premise that actual malice could not be proved because Mr. Wiemer could not in the first place establish that any statements false as to him had been "directed" at Wiemer. On the other hand, Part V of Justice Johnson's opinion restates the district court's language, "[e]ven viewing the evidence most favorably to Mr. Wiemer by giving him the benefit of all proper inferences, there is no evidence that shows with convincing clarity that Mr. Rankin acted

---

1. Other than for the final sentence, the trial court's analysis is supported by the record. In his deposition testimony, Mr. Rankin, on more than one occasion, insisted that the sole purpose of his article was to make Kootenai County citizenry aware of Mr. Walker's incompetence. Nevertheless, Mr. Rankin could still be found to have acted with actual malice (reckless disregard) regarding Mr. Wiemer's inclusion in his Walker article.

with the requisite malice in publishing the subject article," to which the majority opinion simply adds: "We agree." At 576, 790 P.2d at 357. Such is hardly a satisfactory appellate court analysis when the appellate court generally places no reliance on the district court's analysis. If the appellate court did so, it could simply adopt the *ratio decidendi* of the lower court.

In *Hutchinson v. Proxmire*, 443 U.S. 111, 120, 99 S.Ct. 2675, 2680, 61 L.Ed.2d 411 (1979), the United States Supreme Court had before it a defamation case in which the district court and the circuit court had precluded a private plaintiff from pursuing redress in damages alleged to have resulted from a libelous publication. The Supreme Court noted that "the District Court said that in determining whether a plaintiff had made an adequate showing of 'actual malice,' summary judgment [for the defendant] might well be the rule rather than the exception." The United States Supreme Court painstakingly paused in *Hutchinson* to respond to that assertion by its footnote 9:

> Considering the nuances of the issues raised here, we are constrained to express some doubt about the so-called 'rule.' *The proof of 'actual malice' calls a defendant's state of mind into question, New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), *and does not readily lend itself to summary disposition.* See 10 C. Wright & A. Miller [& M. Kane], Federal Practice and Procedure § 2730, pp. 590–592 (1973). *Cf. Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). In the present posture of the case, however, the propriety of dealing with such complex issues by summary judgment is not before us.

*Hutchinson*, 443 U.S. at 120, 99 S.Ct. at 2680 (emphasis added). Wright, Miller & Kane, say much the same:

> [S]ummary judgment frequently is denied in contract actions requiring an inquiry into the intentions of the contracting parties, or in antitrust cases in which the intentions or motives of the alleged conspirators are crucial. The good faith or motive of defendant also plays a significant role in cases involving civil rights and discrimination and in patent litigation.
>
> Similarly, *cases involving malice necessarily call defendant's state of mind into question and* summary judgment often will be refused when that issue is raised. *This is true,* for example, *in actions for libel and slander,* although competing policy considerations there may argue for granting summary judgment.

10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2730, 240–42 (2d ed. 1983) (emphasis added). However, none of the authorities available present a more compelling case than does Mr. Wiemer for placing the witnesses on the stand and letting the jury reach a determination as to the existence of actual malice on the part of the defendant. Where I apparently differ from Justice Johnson is in my reading that we function only so far as to make an independent determination of whether or not there is a genuine triable issue as to defendant's liability for bringing Mr. Wiemer into the publication. Clearly there is that triable issue. In fact, this almost appears as a matter of law, which I say because of my concern over the invalidity of the majority's belief that the publication—*as to Mr. Wiemer, and as written*—was a matter of public concern or interest. Most assuredly, it appears that this is not so, but even if it were a matter of public concern, Mr. Wiemer has made a strong showing of actual malice (reckless disregard) needlessly directed at him by name which should be determined by a jury.

No one should challenge the district court's specific finding that "... the thrust of the entire article published by Ronald Rankin was to publicly criticize and comment on Glen Walker's performance in office as the Kootenai County Prosecuting Attorney." R., 214. Undoubtedly it was. Mr. Rankin was out to shoot an eagle, but in the process of attempting that accomplishment, he shot down swallows. This statement by the district court brings to the fore another issue which seems to have

been overlooked in the trial court proceedings, and again in this Court. Until now the defendant has been allowed, and now in this Court the defendant is being accorded, all of the immunity-from-suit rulings which have been granted to "the media," *i.e.,* publishers of newspapers and broadcasters of radio and television. However, it is highly doubtful whether the defendant's publication was in fact a news*paper,* or whether it was a news*letter.* On its face, at the least there is an ambiguity. On the first page of the *Vox Pop* is a clear concession that the Glen Walker article was drafted for publication in the NORTH IDAHO SUNDAY, which is apparently a publication of the Coeur d'Alene Press. The explanation is given that publication of Mr. Rankin's article in the NORTH IDAHO SUNDAY was killed, and did not take place. Thereafter the article was printed and disseminated by the defendant.[2] The publication appears to be a newsletter, and we are not informed by Mr. Rankin in his deposition testimony whether it was not regularly published, and had no subscribers thereto or advertisers therein. It cannot be found in any of the libraries in Boise.[3] It is notable that the copy contains no advertising, and no price for it is listed, nor is there any indication therein of whether it is sold locally, or merely given away by mail and free distribution, as per the footnote 4 below.

The Supreme Court has discussed and distinguished private speech from forms of public speech. In *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), the United States Supreme Court commented as follows:

> The Court most recently considered the constitutional limits on suits for defamation in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). In sharp contrast to *New York Times, Dun & Bradstreet* involved not only a private-figure plaintiff, but also speech of purely private concern. 472 U.S., at 751–752, 105 S.Ct., at 2941–2942. A plurality of the Court in *Dun & Bradstreet* was convinced that, in a case with such a configuration of speech and plaintiff, *the showing of actual malice needed to recover punitive damages under either New York Times or Gertz was unnecessary:*
>
> > In light of the reduced constitutional value of speech involving no matters of public concern, we hold that the state interest [in preserving private reputation] adequately supports awards of presumed and punitive damages—even absent a showing of "actual malice." 472 U.S., at 761, 105 S.Ct., at 2946 (opinion of POWELL, J.) (footnote omitted), *id.,* at 774, 105 S.Ct., at 2953 (WHITE, J., concurring in judgment).

*Philadelphia Newspapers,* 475 U.S. at 774, 106 S.Ct. at 1562–1563 (emphasis added).

It seems more likely than not that bringing Mr. Wiemer into the article was (by any evidence presented in the summary judgment proceedings), not a matter of public concern. Another factor to be cranked into the equation is that defendant had no need to name Irvin Wiemer in his article. The article could have been written, as it was admittedly intended, to assail Mr. Walker's performance as Kootenai County Prosecutor, including Mr. Walker's involvement in an unsolved 1980 homicide, without ever mentioning Mr. or Mrs. Wiemer. To mention Mr. Wiemer by name six years after the incident in an article aimed only at Mr. Walker is sufficiently out of the ordinary to strongly raise an inference of *reckless* indifference to the consequences. Moreover, not *fairly* stating the supposed case against Mr. Wiemer, as Justice Johnson has pointed out, certainly borders on reckless disregard of whether the case was false or not. Finally, by professing to be

---

2. This is established by Mr. Rankin's deposition testimony.

3. At his deposition, Mr. Rankin stated that a prior publication of his, *Common Sense, was a newsletter.* His testimony also established that distribution of *Common Sense* and *Vox Pop,* particularly the Walker Article, was by select mail addresses, and also by distribution to supermarket stands where it could be freely picked up.

knowledgeable to the extent of exalting the article's veracity in terms of "overwhelming and irrefutable" the defendant displays an awareness of the article's falsity. The overkill in choice of words is not defensible. It does not appear that the death of Mrs. Wiemer six years earlier continued to be a matter of public concern. It very well could have been thrown into the article on Walker only for the bit of sensationalism that it might add.

In the *Hutchinson* case, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411, the Supreme Court of the United States dealt with a case where the plaintiff was libelled by the dissemination of a newsletter similar to Mr. Rankin's newsletter. Reversing both the United States District Court and the Court of Appeals, the High Court held that what Senator Proxmire *uttered in the Senate* was protected by a specific grant of immunity contained in the Constitution of the United States, but that *such immunity did not attach to his newsletters or press releases,* none of which were "essential to the deliberations of the Senate." [4] Just as the Supreme Court held in *Hutchinson* that defendants charged with alleged defamation cannot by their own conduct create their own defense by purportedly making their victim into a public figure, it is equal-

ly true that the defendant in this case cannot by his own article make a stale homicide case into a matter of public interest or concern when in actuality it appears that there was, other than for defendant's article, no showing of any genuine public interest or concern for the previous six years.[5] Clearly, then, a triable issue of fact as to Mr. Rankin's state of mind has been raised, and the issue should be tried and decided.

There are a number of passages in the Supreme Court's most recent defamation opinion which lend considerable support to Wiemer's right to lay his case before a jury. First, though, in setting the stage for applying *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. ——, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989), to Wiemer's case, it is in order to consider the teaching of *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), "that an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose,* 466 U.S. at 499, 104 S.Ct. at 1958.[6] In *Bose,* the Supreme Court's con-

4. *Hutchinson,* 443 U.S. at 130, 99 S.Ct. at 2685–86, quoting *Gravel v. United States,* 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d 583 (1972). Should Mr. Rankin at trial be determined to have defamed Mr. Wiemer, and to have done so by newsletter, as in *Hutchinson,* then in all likelihood the following observation of the Supreme Court in *Hutchinson* would apply:

> Neither the District Court nor the Court of Appeals considered whether the *New York Times* standard can apply to an individual defendant rather than to a media defendant. At oral argument, counsel for Hutchinson stated that he had not conceded that the *New York Times* standard applied.... This Court has never decided the question; our conclusion that Hutchinson is not a public figure makes it unnecessary to do so in this case.

*Hutchinson,* 443 U.S. at 133–34, 99 S.Ct. at 2687, n. 16. Query, even assuming that the 1980 homicide death of Mrs. Wiemer was a matter of public interest when the 1986 article was published, can the *New York Times* standard apply to an individual defendant rather than to a media defendant, and, was Mr. Wiemer a public figure?

5. Mr. Rankin's deposition testimony demonstrates that he had been a resident of Kootenai County since 1965, but that he had no previous knowledge whatsoever of the death of Mrs. Wiemer. He reportedly received an anonymous telephone call in December of 1986, or January of 1986, wherein the caller said, "I understand that you're interested in Walker and that—that if you want to see something that is—that will really astound you—words to that effect—you should check on this case in Post Falls." The caller, according to Mr. Rankin's deposition, went on to say the case was about Debbie Wiemer, and the caller advised Mr. Rankin to check with the Post Falls police.

6. In this regard the circumstances are unlike those present in *Bandelin v. Pietsch,* 98 Idaho 337, 563 P.2d 395, *cert. denied* 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 177 (1977), a case also cited and relied upon in Justice Johnson's opinion. In that case the defendant newspaper claimed some of the information repeatedly published in the newspaper came from a highly respected district judge. *See* Appendix A attached, the district judge's affidavit which went wholly unmentioned in the court's opinion—a most shameful display of appellate review.

cern was with Rule 52(a) of the Federal Rules of Civil Procedure which states that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Said the Court: "It surely does not stretch the language of the Rule to *characterize an inquiry into what a person knew at a given point in time as a question of 'fact.'*" *Bose*, 466 U.S. at 498, 104 S.Ct. at 1958. Although concededly in Mr. Wiemer's case we have no findings as such, yet, we have deposition testimony and we have taped and transcribed police interviews of the various persons, including Wiemer, and we are certainly obliged to give any and all reasonable inferences to Wiemer in making our review. And we, presumably all five of us, are required to independently examine the entire record.

In *Harte–Hanks*, the first paragraph of the Court's opinion cited *Bose* for the proposition that judges in defamation cases have *a constitutional duty* to "exercise independent judgment whether the record establishes actual malice with convincing clarity." 491 U.S. ——, 109 S.Ct. 2678, 105 L.Ed.2d 562. In context that statement was not relative to a district court denial of a motion for summary judgment. The plaintiff's claim had gone to trial before a jury. The jury found by a preponderance of the evidence that plaintiff had been defamed by a publication which was in fact false, and that the article in question had been published with actual malice. 109 S.Ct. at 2682.

Our inquiry, however, does not concern a case which has gone to a jury verdict for plaintiff, but rather a case which did not proceed to trial because it was dismissed at summary judgment proceedings. Nevertheless, it clearly appears from a reading of the cases cited herein, that our review of a summary judgment of dismissal requires a review of the same stature as that which we would make were we reviewing a case which had been tried, *i.e.*, an independent review of the entire record in order to ascertain if the plaintiff's showing precluded the entry of summary judgment of dismissal. Mainly, then, our independent re-view should be singularly aimed at determining whether the plaintiff is entitled to take his case before a jury and let it decide the question of defendant's actual malice in causing to be printed and then disseminated the article on Walker which allegedly defamed Mr. Wiemer.

Independent review involves reading, *inter alia*, the depositions of Irvin Wiemer, Ron Rankin, the deposition of Detective Randy Bohn, the transcript of the taped police interview of Irvin Wiemer by Bohn, and of Debbie Wiemer's mother and grandmother, a later second interview of Irvin Wiemer, and the report of a polygraphist from Lewiston, Idaho, employed by the Department of Law Enforcement, who concluded that Mr. Wiemer was being truthful in his account of Debbie Wiemer's death. Much like the scenario in the *Harte–Hanks* case, where the person most highly involved, Patsy Stephens, was not interviewed by the reporter who would write the article, so in Mr. Wiemer's case, Ron Rankin printed and disseminated his article without contacting the sheriff, Mr. Walker, Mr. Wiemer, Mr. Stalder (who was Mr. Walker's investigator), or any other person who might have had information regarding the incident, especially including the polygraphist. Primarily, as Rankin admitted in his deposition, Rankin relied on Detective Bohn's opinions as the basis for his article. Yet *it was Mr. Rankin, not Detective Bohn, who* in authoring, printing, and disseminating his article, *declared the evidence irrefutable and overwhelming.*

As has been seen, Justice Johnson in authoring the opinion for the Court makes much of Mr. Wiemer's failure to establish that Detective Bohn was not a credible source. That is as pure a case of juxtaposturing as one might encounter. Detective Bohn was a source relied upon by Mr. Rankin. It was Rankin, the defendant, who moved for summary judgment of dismissal; Mr. Wiemer did not move for summary judgment. If Bohn's credibility and accuracy was an issue, it was up to the defendant to exert it, not up to Wiemer to prove the contrary, and likewise not up to Wiemer to *prove* that Bohn was not a

credible witness, or to *prove* that Rankin was not a credible witness. All that was needed on Wiemer's part to withstand the defendant's motion was a sufficient showing that Rankin published his Walker article with reckless disregard for the veracity thereof. At trial the jury would be concerned with the credibility of the defendant, and any witnesses which he produced to give sworn testimony on his behalf, including Bohn. Unless there is a point involved presently beyond my comprehension, it would seem that any attempt on Rankin's part to testify to what Bohn, or any other of his sources told him, would be rejected on a hearsay objection. This Court has held that conclusory matter in affidavits, hearsay, and other inadmissible evidence, will be disregarded when considering a summary judgment. *See Corbridge v. Clark Equipment Co.*, 112 Idaho 85, 87, 730 P.2d 1005, 1007 (1986) (conclusory affidavit disregarded); *Tapper Chevrolet Co. v. Hansen*, 95 Idaho 436, 439, 510 P.2d 1091, 1094 (1973) (affidavits in support or opposition to summary judgment must set forth facts admissible into evidence); *Openshaw v. Allstate Ins. Co.*, 94 Idaho 192, 196, 484 P.2d 1032, 1036 (1971) (lay opinion in affidavit disregarded).

The Supreme Court in *Harte–Hanks* stated that:

Although courts must be careful not to place too much reliance on such factors, a *plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence,* see *Herbert v. Lando*, 441 U.S. 153, 160 [99 S.Ct. 1635, 1640, 60 L.Ed.2d 115] (1979); *Tavoulareas v. Piro*, 260 U.S.App.D.C. 39, 66, 817 F.2d 762, 789 (en banc), cert. denied, 484 U.S. 870 [108 S.Ct. 200, 98 L.Ed.2d 151] (1987), *and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry.*

*Harte–Hanks*, 109 S.Ct. at 2686 (emphasis added). In this case, Mr. Rankin's own deposition testimony is sufficient to have (in a summary judgment proceeding) demonstrated a reckless state of mind where truth was concerned, in his failure to conduct a thorough review of the available sources of information. Certainly he showed almost total indifference as to whether the article which he wrote and disseminated was, as to Wiemer, inaccurate and untrue. This conduct considerably exceeds assessing the article as "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers," assuming that Mr. Rankin is genuinely of the media, and entitled to all of the protection which the United States Supreme Court has provided publishers and broadcasters. *Harte–Hanks* seemingly makes it clear indeed that the failure of a reporter, again making that assumption, to interview persons highly involved is circumstantial evidence which must be taken into consideration. Paraphrasing the language of Justice Scalia in his separate *Harte–Hanks* opinion, 109 S.Ct. at 2700: Even if one believed Rankin's explanation of why he did not listen to the tapes (of Mr. Wiemer, Mr. Walker, the coroner, or the polygraphist) it would still be reasonable to find (and I would find) clear and convincing proof of malice from the utterly inexplicable failure to interview Mr. Wiemer, Mr. Walker, the coroner, the polygraphist, and Mr. Stalder, plus the uncontroverted evidence in the Weimer case.

## APPENDIX A

STATE OF IDAHO

SS

COUNTY OF BONNER

I, Dar Cogswell, being first duly sworn on oath, deposes and says:

I have read an excerpt of the transcribed oral deposition of Morgan Monroe that has been furnished to me by Mr. Bistline.

As I understand Mr. Monroe's deposition, the first article that appeared in the Sandpoint News Bulletin concerning the Talbot Estate was published on Thursday, August 12, 1971; that prior to the second publication on August 19, 1971, Mr. Monroe alleges that he talked to me extensively concerning the Talbot case and that I used the

phrase which he quoted in the second article as follows:

"This is a puzzling case that has shaken the legal community in this area."

I have no recollection of making such a comment to Mr. Monroe. I have never represented myself as speaking for the "legal community." I had no indication of how the legal community felt concerning the Talbot Estate except that I knew that the attorneys who represented Mr. Bandelin felt that no contempt charge had been made against him.

My recollection is further supported by my court minutes and travel expense vouchers which show that I could not have talked to Mr. Monroe between the first publication of the News Bulletin on August 12, 1971, and the second publication on August 19, 1971, for the reason that I was not available in my office in Sandpoint, Idaho, but that I was out of town performing court business as follows:

A. Thursday, July 12, 1971—Coeur d'Alene, Idaho Judicial Conference—8:00 A.M. to 5:00 P.M.

B. Friday, July 13, 1971—Coeur d'Alene, Idaho Judicial Conference—8:00 A.M. to 5:00 P.M.

C. Saturday, July 14, 1971—Coeur d'Alene, Idaho Judicial Conference—8:00 A.M. to 5:00 P.M.

D. Sunday, July 15, 1971—At home in Sandpoint. I have never had a conversation with Mr. Monroe at my home concerning legal matters.

E. Monday, July 16, 1971—Coeur d'Alene, Idaho Judicial Conference—8:00 A.M. to 5:00 P.M.

F. Tuesday, July 17, 1971—Wallace, Idaho West vs. West—7:00 A.M. to 5:00 P.M.

G. Wednesday, July 18, 1971—Bonners Ferry, Idaho Law Day—8:30 A.M. to 5:00 P.M.

DATED this 9th day of December, 1974.

/s/ Dar Cogswell
Dar Cogswell

*Bandelin v. Pietsch*, 98 Idaho 337, 563 P.2d 395 (1977), R. 91–2.