Argued and submitted June 10, 1981, affirmed May 4, 1982

# WESTERN ALLIANCE CORPORATION,
*Appellant - Cross-Respondent,*

*v.*

# WESTERN RELIANCE CORP. et al,
*Respondents,*

## SCHNABEL,
*Respondent - Cross-Appellant.*

(No. A7808-14187, CA 17973)

643 P2d 1382

Ridgway K. Foley, Jr., Portland, argued the cause for appellant - cross-respondent. With him on the appellant's brief were Nancie Potter Arellano, and Schwabe, Williamson, Wyatt, Moore & Roberts, Portland. With him on the appellant's reply brief were Mildred J. Carmack and Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

Martha M. Hicks, Portland, argued the cause for respondents and respondent - cross-appellant. With her on the brief was Duffy, Gibson, Hicks & Huber, Portland.

Before Gillette, Presiding Judge, Young, Judge, and Fort, Senior Judge.*

FORT, S. J.

---

* Fort, S. J., *vice* Roberts, J.

## FORT, S. J.

Plaintiff Western *Alliance* Corporation sought damages for unfair competition from individual defendants Wilson and Schnabel and from the corporation that the two men had formed, Western *Reliance* Corporation. In a second cause of action, it sued Wilson in debt for unearned commissions. The individual defendants, both former employes of plaintiff Western Alliance, counterclaimed for unpaid commissions (Wilson) and for damages (Schnabel). The trial court directed verdicts against plaintiff and Schnabel on their claims against each other. The rest of the claims were submitted to a jury, which found for the defendant corporation and Wilson on plaintiff's unfair competition claim and for Wilson on his counterclaim for unpaid commissions. The jury found for plaintiff against Wilson on the claims for unearned commissions. From the resulting judgment, Western Alliance appeals and Schnabel cross-appeals. We affirm.

Both corporations are insurance agencies engaged in the business of selling and servicing a form of insurance known as vendor's single interest insurance "VSI." VSI provides physical damage coverage to the financing agents in automobile sales transactions. Lending agencies require this coverage as part of their individual credit agreements with buyers to whom they lend money to purchase a vehicle. Agencies that provide this form of insurance deal only with banks, finance companies, and credit unions in a "wholesale" capacity; they do not sell VSI insurance to the general public. Because of the number of transactions for which a particular lender may require coverage, continuing service by the insurance agency is an important aspect of the VSI business. The agency itself does not insure the automobiles but writes VSI policies on behalf of its carriers, who are the real insurers. In Oregon, agents representing insurance agencies, including those which sell VSI coverage, are required to be licensed to "solicit, sell or transact insurance." ORS 744.005. An agency itself may be so licensed and, in such a case, individual agents working for the agency may be carried on the agency license. Finally, agents and agencies may be licensed to represent as many carriers as are willing to appoint them. ORS 744.145.

Defendant Wilson became licensed to sell VSI insurance in 1973. Thereafter, Wilson and others formed Central West Insurance and sold VSI under the Central West license. He remained with Central West until December, 1975, when he left to work for plaintiff. While an agent for Central West and through more than a year of effort, Wilson developed accounts for Central West with Ford Motor Credit Corporation and with the Oregon Telco and Portland Federal Employees Credit Unions, hereinafter "Ford" and "Credit Unions."

In late 1975, Schnabel, then the northwest manager and a vice-president of plaintiff, approached Wilson about Wilson's coming to work for plaintiff. Wilson spoke with plaintiff's owner and president, Yohanon, and plaintiff's vice president, Sword, about "bringing [his] business to their agency." Apparently, these discussions occurred while Wilson was still with Central West. Sword testified that Wilson was interested in a new agency because Central West was losing its VSI carriers and, thus, its ability to write insurance for Wilson's customers. Wilson denied that the loss of carriers prompted his interest in working for plaintiff. In any event, it is undisputed that Wilson's ability to bring certain accounts with him from Central West to plaintiff was an important factor in plaintiff's decision to employ Wilson. Those accounts included Ford and the Credit Unions, which are the insureds whose accounts and premium payments gave rise to this litigation.

Wilson became an employe of plaintiff in early December, 1975. By agreement, Wilson was to receive a salary and expenses and a share of commissions once they reached a certain level. He testified, in effect, that under this original agreement he was to act on behalf of plaintiff in selling VSI and to bring with him the accounts he had developed at Central West. He was placed on plaintiff's Oregon agency license and worked under Schnabel's supervision. Plaintiff does not dispute Wilson's assertion that he had succeeded in bringing the Ford account, the two Credit Union accounts and others with him to plaintiff.

The initial agreement between plaintiff and Wilson lasted until approximately January 15, 1976. At that time Wilson, with the full knowledge of plaintiff, accepted a

*full-time position* with Ray Schulten's Ford automobile agency "to develop [an] * * * international sales organization for * * * four-wheel drive [vehicles]," and negotiated a new agreement with plaintiff. The terms of payment with respect to the Ford Motor Credit Corporation account under the new agreement were set out in a letter from Sword to Wilson dated January 19, 1976, that provided in part:

> "From that date (i.e. January 15) forward, we agreed to pay you 3% of the net commissions generated to us from the Ford Motor Credit sources which you have brought or will bring to us as sub agent."

Wilson testified that an oral agreement with identical terms was reached covering the two Credit Union accounts. For his part, Wilson was to be responsible for taking care of problems with the accounts which plaintiff's remaining staff could not solve, *i.e.*, he was to be a "trouble-shooter." He testified that this trouble-shooting took an average of "a couple of hours a week," the rest of his time being spent on his new job with Ray Schulten Ford. With the exception of his participation in an audit of the Ford Motor Credit Corporation account, Wilson's services for plaintiff were confined to "trouble-shooting" until at least June, 1977.

Schnabel, the other individual party defendant in this case, worked for plaintiff until May 30, 1977, when, according to plaintiff, he was "terminated." On June 7, 1977, Schnabel applied to the Oregon Corporation Division to reserve the corporate name, Western Reliance Corp. Also in June, Schnabel agreed to lease premises at 1730 S. W. Skyline Blvd. in Portland. Plaintiff had previously leased the same office space under a one-year agreement which terminated June 30, 1977. Although plaintiff alleged in its complaint that Schnabel's acquisition of the office had forced it to move elsewhere, Sword testified that (1) plaintiff's unwillingness to enter a three-year lease, (2) the landlord's unwillingness to accept a lease for a shorter term and (3) plaintiff's interest in a smaller space actually caused plaintiff's move from the Skyline location. On July 8, 1977, Schnabel incorporated Western Reliance and, on July 26, he applied for an insurance license for his new agency. Western Reliance was to sell VSI, and, therefore, would become a competitor of plaintiff.

Wilson testified that shortly after Schnabel left plaintiff's employ, Sword and Yohanon asked him to take "a little deeper interest" in the business. Wilson agreed to do so if he had time. According to Wilson, he began spending a "great deal" of his time on plaintiff's business, doing things for which he had not been responsible under the January, 1976, agreement. He asked for, but did not receive, payment for these extra services.

Wilson also testified that Sword and Yohanon on "numerous occasions" had discussed with him how "we could cut down the number of people either in the accounts or in the office [and whether there was] some way * * * to eliminate these people in the Oregon office" by moving the "paper work" and "day-to-day activities" to plaintiff's San Mateo, California, offices. Such a plan would include removal of employes paid by plaintiff and working in the offices of plaintiff's accounts, including the two Credit Unions. Wilson stated that he had "originally sold the accounts" on the promise of the continuation of such service, and that when he learned of plaintiff's plans, he "knew the accounts would find some other way to do their business."

During the summer months of 1977, following Schnabel's leaving to set up his own agency, the Credit Unions, according to Wilson, became unhappy with plaintiff's service and with plaintiff's plans to curtail that service. Wilson testified that he communicated the concerns of the accounts to plaintiff's officers.

On August 9, 1977, Wilson filed an application to be included on the Western Reliance license — the license of the defendant corporation. The next day, Wilson purchased 72 shares (approximately 34 percent) of Western Reliance stock and became a director of the corporation. On August 15, 1977, he became secretary of the corporation. During this period and through at least September 1, 1977, he remained a "subagent" of plaintiff.

Sometime in the latter part of August, 1977, Wilson met with representatives of the two Credit Unions and told them that, in order to maintain the level of service he had originally promised, they should move to Schnabel's company, which offered "better service at a better price."

In early September, 1977, Wilson told Sword he was an investor in Western Reliance and that the Credit Unions were going to be moving there. After consulting legal counsel, Sword, on October 7, 1977, wrote Wilson a letter, reciting Wilson's interest in Western Reliance and his attempts to transfer accounts away from plaintiff and concluding as follows:

> "It is our position that you have breeched [sic] both moral and legal responsibilities to us and we therefore advise that this termination is without further obligation to you after September 1, 1977."

### The Unfair Competition Claim Against Wilson and Western Reliance

Plaintiff contends that the trial court erred in denying plaintiff's motion for a directed verdict on the liability of defendants Wilson and Western Reliance for unfair competition. Plaintiff also makes the corollary argument that there was insufficient evidence to support the jury's verdict in favor of Wilson and Western Reliance on this cause of action.

Basically, plaintiff's argument is as follows:

(1)  Wilson admitted that while he was a "subagent"[1] for plaintiff, he encouraged at least two of plaintiff's customers to move their business to Western Reliance Corporation, in which Wilson held stock and served as an officer and director;

(2)  That conduct was a breach of Wilson's duty as an agent "* * * to act solely for the benefit of the principal in all matters connected with his agency," Restatement (Second) of Agency § 387 (1958), and also constituted a breach of his duty as an agent "not to compete" with plaintiff "[u]nless otherwise agreed," Restatement (Second) of Agency § 393 (1958); therefore,

---

[1] "Agent" is defined in the Oregon Insurance Code. ORS 731.062. "Subagent" is not. It is, however, defined and the complex relationships which it may or may not encompass are described in Restatement (Second) of Agency § 5(1) (1958) and in the lengthy comments a, b, c, d and e thereto. We note that the letter from Sword to Wilson, which plaintiff urges contains the whole contract between plaintiff and Wilson in unambiguous language, gives little description of the duties which each is to perform for the other.

(3) Plaintiff was entitled to a directed verdict on the issue of unfair competition, or, in the alternative, the verdict in favor of Wilson and Western Reliance should be reversed because it is not supported by sufficient evidence.

■ For the reasons set out below, we disagree. As we stated recently in *Taylor v. Gaudry,* 46 Or App 235, 242, 611 P2d 336 (1980):

"On the plaintiff's motion for a directed verdict against the defendant, the motion admits the truth of the defendant's evidence and every inference of fact that may be drawn from the evidence, and the evidence must be interpreted in the light most favorable to the defendant. *Carey v. Hays,* 248 Or 444, 446, 434 P2d 331 (1967). If reasonable minds can differ as to the inferences to be drawn from the evidence, the motion will be denied. *Resser v. Boise-Cascade Corporation,* 284 Or 385, 587 P2d 80 (1978)."

From our review of the record, we find substantial evidence to warrant submission of certain questions of fact to the jury, including the nature and scope of Wilson's subagency with plaintiff, and whether and to what extent plaintiff understood that Wilson, even though a subagent, could be expected to compete.

(a) *The Nature and Scope of Wilson's Subagency with Plaintiff*

Restatement (Second) of Agency § 376 (1958) and comment a to that section provide that, as a "general rule," the nature of an agent's duties are determined by the agency agreement:

"§ 376 General Rule

"The existence and extent of the duties of the agent to the principal are determined by the terms of the agreement between the parties, interpreted in light of the circumstances under which it is made, except to the extent that fraud, duress, illegality, or the incapacity of one or both of the parties to the agreement modifies it or deprives it of legal effect.

"Comment:

"a. * * * Ordinarily, the duties of the agent are the result of inferences from the conduct of the parties. Thus, the duties, described in Section 379 as duties of care, those stated in Section 385 as duties of obedience, and those stated in Sections 387-398 as duties of loyalty, are inferences drawn from the conduct of the parties in light of

common experience and what reasonable men regard as fair. The rules stated in such Sections are the rules applicable to the normal case, in which the parties have not made a different agreement. * * *"

■ In order to apply the principles set out in Restatement (Second) of Agency §§ 387 (duty of loyalty) and 393 (duty not to compete), it is necessary to determine from the agreement of the parties the nature and scope of the agency to which the parties have consented. If there is evidence that raises a question of fact as to the nature and scope of the agency, it follows that, in a case such as this in which certain conduct of an agent is said to constitute a breach of a duty owed to the principal, it would be proper to submit the question of breach of duty to the jury. There is such evidence.

■ Plaintiff states in its brief that "[f]rom December 1975 * * * to October 7, 1977 * * * [Wilson] was [employed as] a salesman in Western Alliance's four-person Portland office." However, Wilson's employment relationship with plaintiff changed fundamentally in mid-January, 1976, when Wilson became a full-time employe of Ray Schulten's Ford automobile agency and ceased to be a full-time employe of plaintiff. Thereafter, Wilson, under a new agreement, *infra,* was a "subagent" and acted as a "trouble-shooter," spending an average of 'a couple of hours a week' solving problems with the accounts which plaintiff's regular employes could not handle. Apparently, Wilson was under no obligation to seek out new accounts and could fulfill his part of the agreement by servicing the accounts he had previously secured. The parties operated under this new agreement until October 7, 1977.

Wilson's statement that in August, 1977, he "attempted" to "keep" the accounts for plaintiff — implying that it was his job to do so — must be considered in the context of his responsibilities as a "trouble-shooter"; i.e., there would appear to be a significant question whether Wilson as a "trouble-shooter" had the ability or the duty to resolve the customers' dissatisfaction with plaintiff's plans to remove in-house employes and process the Oregon clerical work in California. Finally, there was testimony concerning an insurance agent's duty to his customers which

would tend to support Wilson's assertion that, in encouraging the accounts to move their business, he acted in an "advisory capacity" and not in a manner inconsistent with his duties to plaintiff.

Given such a record, we hold that there was sufficient, competent evidence to raise a jury question as to the nature and scope of Wilson's subagency and, thus, whether, under the January, 1976, agreement there arose duties owed to plaintiff which Wilson breached by encouraging the Credit Unions to move their business.

(b) *Was Wilson's Competition, If Any, To Be Expected?*

■     Restatement (Second) of Agency § 393, comment a (1958), provides, in pertinent part:

"There is no violation of the agent's duty [not to compete] if the principal understands that the agent is to compete; a course of dealing between the parties may indicate that this is understood."

Restatement (Second) of Agency § 394, comment b provides:

"*When Agent Can Properly Act for Competitors.*

"b. The agent commits no breach of duty by acting for competitors if, at the time of his employment, the principals have reason to know that the agent believes that he is privileged to do so. * * *. In many cases the circumstances indicate an understanding that the agent is entitled to act for principals whose interests conflict, although none of them know that he is so acting or that he intends to do so. * * * Ordinarily, if the agent can properly act on his own account in competition with the principal (see § 393), he is entitled to act for others."

At trial, Richard Cincotta qualified, without objection, as an expert witness "in the area of the practices of the VSI insurance business in the state of Oregon." His testimony concerning those practices and, in particular, the relationships between the insurance agency (principal) and its agents and between the customers of the agency and the agents in the VSI field was extensive and included the following observations: (1) that he would expect an agent named on an agency license and receiving commissions from that agency to "switch" the agency's customers to

some other insurance carrier or agency if that were in the customers' interest; (2) that such episodes occurred "many times" in the industry; and (3) that, absent a non-competition agreement between the agent and the agency, the customers belong to the agent and such was the general understanding in the business. (No non-competition agreement existed between Wilson and plaintiff.)

This principle must have been understood by plaintiff. Plaintiff's president, Yohanon, testified that the prospect of Wilson's bringing to plaintiff the accounts he had developed at Central West was discussed during negotiations leading to Wilson's employment by plaintiff. He agreed that this ability was "part of the reason" Wilson was hired. Wilson testified that his ability to bring his accounts with him "* * * was a major attraction of my coming to work for them."

This testimony of Cincotta, Wilson and Yohanon also was ample to raise a question of fact. It was proper for the trial court to allow the jury to consider, as a part of the unfair competition claim, whether both plaintiff and Wilson understood that Wilson, under their agreement, might compete with plaintiff in placing coverage. Plaintiff's motion for a directed verdict against Wilson and Western Reliance Corp. was properly denied.

*Plaintiff's Claim Against Schnabel for Unfair Competition*

■ Plaintiff also assigns error to the court's granting of defendant Schnabel's motion for a directed verdict on plaintiff's principal cause of action — unfair competition.

It is uncontradicted that plaintiff terminated Schnabel's employment on May 30, 1977. Restatement (Second) of Agency § 393, comment e (1958) states:

> "*Preparation for competition after termination of agency.* After the termination of his agency, in the absence of a restrictive agreement, the agent can properly compete with his principal as to matters for which he has been employed. See § 396. *Even before the termination of the agency, he is entitled to make arrangements to compete,* except that he cannot properly use confidential information peculiar to his employer's business and acquired therein. Thus, before the end of his employment, he can properly purchase a rival business and upon termination of

employment immediately compete. He is not, however, entitled to solicit customers for such rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business." (Emphasis added.)

See also *American Republic Ins. Co. v. Union Fidelity Life Ins. Co.,* 470 F2d 820, 824 (9th Cir 1972).

The principal instance of claimed unfair competition committed before Schnabel's termination was a visit in the middle of May Schnabel made to San Francisco to a VSI carrier to see if it would issue Schnabel an agency for Oregon. Such conduct a fortnight before his termination of employment is clearly within what comment e, *supra,* contemplates that an agent is permitted to do "before the termination of the agency" in making "arrangements to compete." There is no contention made that before termination Schnabel used "confidential information peculiar to his employer's business and acquired therein."

Much of plaintiff's argument is predicated on the assumption that, because Wilson was allegedly engaged in unfair competition with plaintiff, Schnabel, through his business relation with Wilson both before *and after* ay 31, 1977, and as president of Western Reliance after its formation, was also guilty of unfair competition. Plaintiff completely fails to show how, if Wilson's conduct or that of Western Reliance did not constitute unfair competition, either as a matter of law, as we have held, *supra,* or fact, in view of the jury's verdict on that issue in favor of Wilson and Western Reliance, related conduct by Schnabel constituted unfair competition. The trial court did not err.

### Wilson's Counterclaim for Commissions

Plaintiff contends that the trial court erred in submitting Wilson's counterclaim for unpaid commissions to the jury. Plaintiff asserts two grounds, in the alternative, for this assignment of error: (1) that the trial court erred in denying plaintiff's motion for directed verdict "because Mr. Wilson did not offer proof of a lifetime compensation contract"[2] and (2) that the court should have determined

---

[2] Under this alternative ground, plaintiff also argues that its motion for directed verdict should have been granted because Wilson's conduct as alleged in

the construction of the contract in question as a matter of law and should not have submitted a question of interpretation of that agreement to the jury. We treat these issues together because both turn on whether a question exists as to the proper interpretation of the agreement.

The claimed commissions were allegedly due Wilson under the parties' January, 1976, agreement. The January 19, 1976, letter from Sword to Wilson setting out the terms of payment to him, part of which is quoted *supra,* at 4 states:

> "In connection with your discussions with Jim Schnabel and further to our telephone conversation this morning, this letter will serve as confirmation of the matters discussed.

> "1. The salary arrangement established in our letter of December 3rd, concluded effective January 15, 1976.

> "2. *From that date forward,* we agreed to pay you 3% of the net commissions generated to us from the Ford Motor Credit sources which you have brought or will bring to us *as sub agent."* (Emphasis added.)

Wilson contends that the foregoing instrument is ambiguous. Plaintiff denies that it is.

On appeal, the parties agree that Wilson's right to any of the amounts claimed depends upon whether the agreement required plaintiff to pay Wilson "3% of the net commissions" even though Wilson no longer worked full-time for plaintiff, so long as the commissions came from accounts Wilson brought to plaintiff while he was a sub-agent. The period covered by the claim is approximately September 1, 1977, to July, 1979. The parties also agree that Wilson's ability to bring the accounts in question to plaintiff was a significant factor in plaintiff's decision to employ Wilson, and there appears to be no dispute that he fulfilled that expectation.

Plaintiff contends that the agreement is not ambiguous and provides clearly that payments to Wilson are to

the cause of action for unfair competition constituted a breach of his agreement with plaintiff, thus depriving Wilson of any further benefits from it. We have already determined, *supra,* that it was not error to submit the unfair competition claim to the jury and that the jury verdict in favor of Wilson on that issue is supported by substantial evidence. For these reasons, the question of Wilson's claimed breach is moot.

cease upon his leaving plaintiff's employment. Therefore, according to plaintiff, the court should have granted plaintiff's motion for a directed verdict or, in the alternative, should have determined for the jury the proper interpretation of the contract. As we stated in *Bartlam v. Tikka,* 50 Or App 217, 220, 622 P2d 1133, *rev den* 290 Or 853 (1981):

> "Ambiguity is the effect of words that have either no definite sense or have more than one, causing the meaning of the writing to be 'not so clear as to preclude doubt by a reasonable man of its meaning.' " (Citations omitted.)

We conclude that this writing is "not so clear as to preclude doubt."

Ordinarily, in the absence of ambiguity, the construction of a contract is a question for the court and is treated as a matter of law. *McCallum v. Gray,* 273 Or 617, 619, 542 P2d 1025 (1975); *May v. Chicago Insurance Co.,* 260 Or 285, 292, 490 P2d 150 (1971). The determination whether a contract is ambiguous is also, necessarily, a matter of law. *Adams v. Northwest Farm Bureau Ins.,* 40 Or App 159, 164, 594 P2d 1256, *rev den* 287 Or 123 (1979). The trial court here correctly found ambiguity.

In *Evenson Masonry, Inc. v. Eldred,* 273 Or 770, 772, 543 P2d 663 (1975), the court held:

> "When the language of the contract is ambiguous and extrinsic evidence is received to resolve the ambiguity, the interpretation of the contract becomes a question for the trier of fact. * * * The interpretation of the trier of fact will be affirmed on appeal if there is *any evidence* to support the interpretation." (Citation omitted; emphasis added.)

Both plaintiff and defendant Wilson presented testimony concerning the meaning of the contract language in this case. Wilson testified that, by the terms of this agreement, he was to receive "3 percent of those commissions with no time limit, no qualifications," and that plaintiff was to pay that amount "as long as they had the accounts." He also stated that he 'was to take care of these problems [with the accounts] and they could pay me three percent for it." Yohanon testified, on the other hand, that after he had discovered Wilson had "switched" the Credit Union accounts, Wilson telephoned him and asked "to work out a deal with [Yohanon] to continue paying [Wilson] a commission on the Ford Motor Credit Corporation account."

Yohanon stated that he responded "absolutely not" and that he would not deal with a "competitor." Sword testified that the payment agreement meant that "as long as Mr. Wilson was working for us, we would pay him 3 percent."

The words of the contract itself, when read in light of the circumstances existing at the time of its execution, do not resolve the question whether any commission payments under the contract were to extend beyond the date of Wilson's termination. The absence of reasonable certainty in the written instrument concerning the time when and the circumstances under which the obligation to pay the commissions terminates established that the contract was ambiguous and warranted the submission of the issue of its meaning to the jury.

### Schnabel's Cross-Appeal

Lastly we turn to the cross-appeal of Schnabel. Error is assigned to "granting plaintiff's motion for directed verdict against Mr. Schnabel on his counterclaim for his profit share."

Rule 7.19, Rules of Appellate Procedure, entitled "Assignments of Error in Actions at Law" states in part:

> "* * * The assignments of error must be specific and *must set out verbatim the pertinent portions of the record.*" (Emphasis added.)

In *H.N.M. Enterprises, Inc. v. Hamilton,* 49 Or App 613, 621, 621 P2d 57 (1980), we discussed Rule 7.19 at length and pointed out the need to comply with it:

> "This assignment does not set forth verbatim the motion made and the ruling of the court. Rule 7.19. There is no reference to the transcript or the appendix of the brief. We have taken great pains to decipher the assignments of error, insofar as it is possible, within the confines of the brief. We decline to take the further step of reviewing the transcript to determine if a proper motion was made and at what juncture in the trial. Rule 7.19. We decline to review this assignment of error."

Here, too, we decline to review the assignment of error.

Affirmed.