797 P.2d 117

**R.G. NELSON, A.I.A.,**
**Plaintiff-respondent,**

**v.**

**M.L. STEER and Gary Hebener,**
**Defendants-appellants.**

**No. 16807.**

Supreme Court of Idaho.

Aug. 7, 1990.

Samuel Eismann (argued), Eismann & Kosonen, Coeur d'Alene, for defendants-appellants.

Scott W. Reed, Coeur d'Alene, for plaintiff-respondent.

BAKES, Chief Justice.

In 1979, Gary Hebener, a Coeur d'Alene businessman, retained the services of R.G. Nelson, an architect, to design a restaurant to be situated in Riverwood, a real estate development owned by Hebener. The proposed restaurant was to be a "Chart House" restaurant, to be built by Hebener and leased back to Chart House. In March, 1982, Nelson accompanied Hebener to California to present preliminary plans to Chart House. By April, 1982, Hebener and his partner, Mr. Steer, owed Nelson $8264.90 for his services.

On May 5, 1982, Nelson wrote Hebener rejecting a telephone invitation to do more work because "There is no guarantee that I will ever be reimbursed for my services". The letter concluded, "Reluctantly, I'm in a position where I find it impossible to work on your projects any further."

Following this letter, and later during the same month, Nelson traveled to California with Duane Hagadone, another Coeur d'Alene businessman, to meet with Chart House officials to discuss the possibility of securing and locating a Chart House at Hagadone's resort hotel. Nothing came of that contract because Hagadone's concept of an in-house restaurant was contrary to the Chart House scheme of operation.

Early in 1983 Hebener persuaded Nelson to perform an additional 19 hours of work. All services for Hebener by Nelson ended by April 14, 1983, and Hebener retained the services of another architect, Gordon Longwell, to negotiate with Chart House.

Hebener refused to pay for any of the services rendered by Nelson which prompted the instant action wherein Nelson sought payment. Hebener filed a counterclaim alleging that Nelson had interfered with Hebener's prospective business advantage and had breached a fiduciary duty to Hebener. Partial summary judgment in favor of Nelson was granted dismissing the counterclaim. It is the dismissal of the counterclaim that is the subject of this appeal.

Upon a motion for summary judgment all facts and legitimate inferences arising therefrom are viewed most favorably from the position of the non-moving party. However, a party against whom a summary judgment is sought cannot merely rest on his pleadings but, when faced with affidavits or depositions supporting the motion, must come forward by way of affidavit, deposition, admissions or other documentation to establish the existence of material issues of fact which preclude the issuance of summary judgment. *Zehm v. Associated Logging Contractors*, 116 Idaho 349, 350, 775 P.2d 1191, 1192 (1988); *Worthen v. State*, 96 Idaho 175, 176, 525 P.2d 957, 958 (1974); *Tri–State Nat. Bank v. Western Gateway Storage Co.*, 92 Idaho 543, 546, 447 P.2d 409, 412 (1968); I.R.C.P. 56(e). Additionally, "To withstand a motion for summary judgment, the [non-moving party's] case must be anchored in something more solid than speculation; a mere scintilla of evidence is not enough to create a genuine issue." *Edwards v. Conchemco, Inc.*, 111 Idaho 851, 727 P.2d 1279 (Ct.App. 1986). It is not the judge's function to weigh evidence, "but to determine whether there is a genuine issue for trial ... [T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 209 (1986). Summary judgment should be granted if the evidence in opposition to the motion "is merely colorable" or "is not significantly probative." *Id.*

In the instant case the *uncontroverted* facts indicate that Hebener had a longstanding relationship with Chart House. That relationship continued following the Hebener/Nelson meeting with Chart House and following the Hagadone/Nelson meeting with Chart House. There is no indication in the record that Nelson drew plans for any proposed restaurant to be built by Hagadone. Rather, the uncontroverted testimony of Chart House officials indicated that during the brief

meeting between Hagadone, Nelson and the Chart House people, a series of photographs of the Hagadone facility were displayed. This meeting was brief because it became immediately apparent that Hagadone proposed a restaurant that would be part of his overall development, whereas Chart House envisioned a restaurant that would be a stand-alone structure. For this reason, Hagadone's proposal was never really considered by Chart House in their brief meeting.

Hebener's proposal was extensively considered by the Chart House officials, both before *and after* the Hagadone proposal. The deposition testimony of Patrick E. Goddard, the executive vice president of Chart House, is uncontroverted. Goddard testified that the ongoing negotiations between Hebener and Chart House continued for a considerable period of time, and culminated in a proposed lease being sent to corporate headquarters in Louisiana. However, two successive presidents of Chart House recommended that no Coeur d'Alene site be utilized. At the time of the present litigation Chart House had not located and had no future plans to locate in Coeur d'Alene.

Goddard's testimony described the ongoing negotiations between Hebener, Nelson and Chart House and, following the termination of the relationship with Nelson, the new architect hired by Hebener. It was the plans of the new architect which were submitted to, discussed by, and rejected by Chart House officials for reasons unrelated to the Hagadone visit.

The affidavit of Nelson and the deposition testimony of the Chart House CEO stand uncontradicted. Hebener did not respond with any evidence. The trial court had before it no facts indicating the establishment of a "fiduciary" relationship. Even assuming that such a relationship existed, there are no facts indicating a breach of such relationship or an interference with a prospective business advantage. Also, the requisite showing of causation resulting from such breach is missing. As the trial court aptly observed:

> Just as the tort of negligence requires causation, so too, does the tort of interference with prospective advantage. In short, the Plaintiff's conduct in this case may arguably have been unethical ... or he may arguably have breached a fiduciary duty to the Defendant. But, it is beyond dispute that such conduct simply did not have anything to do with the Defendant's loss of prospective advantage. At least the Defendant has failed to come forward with any evidence which could establish a material issue of fact with respect to such an issue. The best that could be said is that the Defendant has raised a suspicion that foul play occurred which caused his lost contract. In the fact of unrefuted admissible evidence, mere suspicion is simply not enough. *Rule 56(e)* I.R.C.P.

In *Johnson v. Jones,* 103 Idaho 702, 707, 652 P.2d 650, 655 (1982), this Court unanimously stated:

> In this case, the Johnson's have failed to introduce *any* evidence that would suggest that Nagel's failure to disclose the possible conflict of interest and obtain their consent before proceeding was a proximate cause of any of the damages alleged in their complaint.... Since there is nothing in the record that would support even an inference that Nagel's failure to disclose his possible conflict of interest proximately caused the damages alleged by the Johnsons, the district court's summary judgment is *Affirmed.*

(Emphasis in original.) The only facts before the trial court were the uncontroverted affidavit of Nelson, and the depositions of the Chart House officers. Based upon the uncontradicted evidence, the trial court did not err in granting summary judgment for respondent Nelson on Hebener's counterclaim.

Summary judgment is affirmed. Costs to respondent.

JOHNSON, BOYLE and McDEVITT, JJ., concur.

BISTLINE, Justice, dissenting.

This case has been interesting to follow as it coursed its way through this Court following Mr. Eismann's appeal from a de-

cision of Judge Haman. Judge Haman's decision ruled that Mr. Hebener could not lay his evidence before a jury and was turned out of court on his claim against Mr. Nelson. For my part, this will be the third opinion which I have written.

The initial opinion for the Court was mine. It quickly commanded a majority comprised of Justice Huntley, Judge Towles,[1] and myself. We concluded that a fiduciary relationship existed between Mr. Nelson and Mr. Hebener.[2] The following is a reprint of excerpts of that opinion which brought us to the conclusion that Judge Haman's decision could not be sustained:

The fiduciary relationship is one which courts traditionally have guarded very closely. Sixty years ago, in an often quoted passage, Justice Cardozo depicted the unique bonds between fiduciaries:

Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. *Wendt v. Fischer,* 243 N.Y. 439, 444, 154 N.E. 303 [1926]. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd.

*Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545, 546 (1928). In Idaho these principles have been applied to the relationship of principal and agent in *Jensen v. Sidney Stevens Implement Co.,* 36 Idaho 348, 353, 210 P. 1003 (1922):

Loyalty to his trust is the first duty which an agent owes to his principal. It follows as a necessary conclusion that the agent must not put himself in such a relationship that his interests become antagonistic to those of his principal. Fidelity in the agent is what is aimed at, and as a means of securing it the *law will not permit the agent to place himself in a situation in which he may be tempted by his own private interest to disregard that of his principal....* The law guards the fiduciary relation, which the relation of principal and agent is, with jealous care. It seeks to prevent the possibility of a conflict between duty and personal interest. It demands that the agent shall work with an eye single to the interest of his principal.

36 Idaho at 353, 210 P. at 1005 (emphasis added).

When a principal questions the loyalty of an agent's actions, the agent has the burden of showing good faith and full disclosure. *Batson v. Strehlow,* 68 Cal.2d 662, 68 Cal.Rptr. 589, 598, 441 P.2d 101, 110 (1968). If one proposes to act as a dual agent in the same transaction or over the same subject matter, he may do so only after full disclosure of his dual agency to both principals. *Meerdink v. Krieger,* 15 Wash.App. 540, 550 P.2d 42, 46 (1976); *See also* Restatement (Second) of Agency § 391. Whether such disclosure occurred is a question of fact. *Meerdink,* 550 P.2d at 46.

Significantly, in the posture in which this case comes to us, whether a fiduciary duty has been breached is a question of fact for the jury and not for the trial court on motion for summary judgment. *Western Alliance Corp. v. Western Reliance Corp.,* 57 Or.App. 263, 643 P.2d 1382, 1387 (1982); *Musselman v. Southwinds Realty, Inc.,* 146 Ariz. 173, 704 P.2d 814, 816 (App.1985) (affirming trial court refusal to direct a verdict and denial of a judgment n.o.v.).

We must note that the trial court dealt with the alleged fiduciary breach curtly and summarily:

---

**1.** The Hon. James G. Towles, District Judge of the First Judicial District, retired, sitting Pro Tem.

**2.** The first five paragraphs of Chief Justice Bakes' opinion are an accurate replay of the initial majority opinion of May 23, 1988.

Just as the tort of negligence requires causation, so too, does the tort of interference with prospective advantage. In short, the Plaintiff's conduct in this case may arguably have been unethical ... *or he may arguably have breached a fiduciary duty to the Defendant.* But, it is beyond dispute that such conduct simply did not have anything to do with the Defendant's loss of prospective advantage.

R., 76 (emphasis added).

The trial court's opinion also demonstrates an incomplete understanding of the broad remedies available for a breach of fiduciary duty. [Footnote deleted.] From the passage cited above, it appears the court believed the remedies available are identical with those for loss of prospective advantage—damages at law flowing from a lost business opportunity. However, there have always been equitable remedies at hand as well.

Upon establishment of a fiduciary breach, the principal may recover in restitution any benefit acquired by the agent:

§ 138. VIOLATION OF FIDUCIARY DUTY.

(1) A fiduciary who has acquired a benefit by a breach of his duty as fiduciary is under a duty of restitution to the beneficiary.

*Comment:*

a. A fiduciary who commits a breach of his duty as fiduciary is guilty of tortious conduct and the beneficiary can obtain redress either at law or in equity for the harm done. As an alternative, the beneficiary is entitled to obtain the benefits derived by the fiduciary through the breach of duty.

Restatement of Restitution, 1937, § 138(1) Comment (a). *See also,* Restatement (Second) of Torts § 874. This could include any compensation paid Nelson by Hagadone.

§ 197. BONUS OR COMMISSION RECEIVED BY FIDUCIARY.

Where a fiduciary in violation of his duty to the beneficiary receives or retains a bonus or commission or other profit, he holds what he receives upon a constructive trust for the beneficiary.

*Id.,* § 197; *see also,* Restatement (Second) of Agency § 403. For a checklist of the principal's remedies, *see* Restatement (Second) of Agency § 399. The bonus, commission, or other profit is recoverable even though the principal has suffered no actual harm.

c. *Where no harm to beneficiary.* The rule stated in this Section is applicable although the profit received by the fiduciary is not at the expense of the beneficiary.... The rule stated in this Section, like those stated in the other Sections in this Chapter, is not based on harm done to the beneficiary in the particular case, but rests upon a broad principle of preventing conflict of opposing interests in the minds of fiduciaries, whose duty it is to act solely for the benefit of their beneficiaries.

Restatement of Restitution § 197 Comment (c). *See also Funk v. Tifft,* 515 F.2d 23 (9th Cir.1975).

Another available remedy to the principal is the avoidance or recovery of compensation paid to the agent by the principal. *Bessman v. Bessman,* 214 Kan. 510, 520 P.2d 1210, 1218 (1974). Restatement (Second) of Agency § 469. Following a deliberate and willful breach, the agent forfeits *all* compensation. *Williams v. Queen Fisheries, Inc.,* 2 Wash.App. 691, 469 P.2d 583, 588 (1970); Restatement (Second) of Agency § 469 Comment (b).

Hebener specifically pled compensation he paid to Nelson as an element of his damages in his counterclaim. R., 20. He did not mention any compensation paid by Hagadone (and for all we know there may have been none). However, the court may grant such relief as is just, notwithstanding that it was not raised in the pleadings. *Twin Falls Farm & City Distributing, Inc. v. D & B Supply Co.,* 96 Idaho 351, 355, 528 P.2d 1286, 1290 (1974). Idaho Rule of Civil Procedure 54(c) provides in pertinent part:

Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to

which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings.

Nelson argues that because his May 5, 1982, letter to Hebener, R., 28, 44, established that his employment with Hebener was terminated, he was not breaching a fiduciary duty of loyalty to Hebener in introducing Hagadone to Chart House executives. However, billing documents in Hebener's affidavit opposing summary judgment, R., 50, show that Nelson worked an additional nineteen hours for Hebener on the Chart House project after May 5, 1982. Thus, a material issue of controverted fact exists over the scope and duration of the fiduciary relationship between the parties. Obviously, the duration of the relationship may impinge on any potential breach arising from the Nelson/Hagadone visit to LaJolla later in May 1982.

That the matter was not appropriate for summary judgment is demonstrated by the words of the trial court: "[Nelson] may arguably have breached a fiduciary duty to [Hebener]." Such "arguable" breach renders the issue manifestly unfit for resolution by summary judgment, particularly in light of the rule of law that whether a fiduciary duty has been breached is a question of fact for the jury. *Western Alliance Corp. v. Western Reliance Corp.* 57 Or. App. 263, 643 P.2d 1382 (1982); *Musselman v. Southwinds Realty*, 146 Ariz. 173, 704 P.2d 814 (App.1985).

Accordingly, we reverse the dismissal of Hebener's cause of action for breach of fiduciary duty and remand for further proceedings consistent with this opinion. Costs to Hebener; no award of attorney fees on appeal.

*Nelson v. Steer*, S.Ct. No. 16807, 1988 Opin. No. 36, May 23, 1988, at 3–8; 88 ISCR 347.

Respondent Nelson petitioned for a rehearing, challenging the validity of a sentence in the opinion which quoted a statement of the Circuit Court of Appeals, Tenth Circuit: "Summary judgment must be denied unless the moving party demonstrates his entitlement to it beyond a reasonable doubt." *Madison v. Deseret Livestock*, 574 F.2d 1027 (10th Cir.1978). It was the consensus of the Court that there was no Idaho case which contained that statement, and it should not have been included in the opinion. Accordingly, a revision was made, a majority was not attained, the Court's membership having dwindled by the loss of Justice Shepard, followed by the resignation of Justice Huntley. The case was reargued to a court comprised of Justices Bakes, Bistline, Johnson, Boyle, and McDevitt.

Justice Shepard's opinion dissenting from the Court's 1988 opinion could have been adopted as their own by those who comprise today's majority, in view of the fact that it is virtually a reprint of Justice Shepard's dissent, which Justice Bakes joined in 1988. Much of what Justice Shepard wrote in 1988 was well written, other than that he, like the majority today, paid little or no heed to the fact that the statements of a Mr. Goddard as to what had been said by Chart House personnel was clearly conclusory and hearsay, and hence not entitled to consideration. From Justice Shepard's 1988 dissenting opinion:

> When asked the reasons for the Chart House refusal to move into the Coeur d'Alene area it was stated:
>
>> Bill Hyde as CEO was a young president that was concerned about the maverick Chart House venture, and that many of our projects had been over budget, and he was holding us back. Ironically, Don Smith wanted to expand more, but killed the Coeur d'Alene location.
>
> Q. I understand he killed that because of certain things, and I won't go into names, of course, but certain things that happened in the Spokane Marketing area. Is that right?
>
> A. Yes.
>
> Q. That had nothing to do with this situation?
>
> A. Yes. That's right.
>
> At another point it was stated:
>
> Q. The final determination by Mr. Smith, again—though you've already said it, I want to make sure—did that

determination have anything to do with the visit that you had with Mr. Hagadone and Mr. Nelson here in San Diego?

A. The meeting with Duane Hagadone had no effect on our relationship with Gary Hebener. The decision by Don Smith in no way was related to a meeting with Duane Hagadone.

At a later point in testimony Goddard was asked:

Q. Did that [the Duane Hagadone meeting] have anything to do with the Chart House?

A. Absolutely not. Absolutely not.

*Nelson v. Steer,* 1988 Opinion No. 36, at 11. Following shortly after the above passage, Justice Shepard observed that:

It should be further noted that the affidavit of Nelson and the deposition testimony of the Chart House official stand uncontradicted. Hebener did not respond with any evidence. Hence, the trial court had before it no facts indicating the establishment of a 'fiduciary' relationship. Even assuming that such a relationship existed, there are not facts indicating a breach of such relationship. Even assuming the establishment of a breach of a fiduciary relationship, the requisite showing of causation resulting from such breach is missing.

*Id.,* at 11. Neither Bill Hyde, the young CEO, nor Dan Smith, his successor, submitted any testimony in the district court, either by affidavit or deposition. Mr. Goddard's testimony was blatant hearsay, and moreover, only *his conclusions* as to what had taken place based, apparently, on what he understood the two CEO's had said or done. In 1988 this was brought forcibly to the attention of Justice Bakes and Justice Shepard in footnote 1 to the majority opinion, which stated:

Hebener does not appeal the dismissal of his cause of action for interference with prospective advantage. Thus, we do not discuss the problem of the trial court's reliance on potential hearsay statements attributed to Don Smith by Patrick Goddard in Goddard's deposition. However, it is well established that *hear-*

*say evidence in depositions* is not admissible in summary judgment deliberations. *See, e.g., Martin v. John W. Stone Oil Distributor, Inc.,* 819 F.2d 547, 549 (5th Cir.1987); *Broadway v. City of Montgomery, Alabama,* 530 F.2d 657, 661 (5th Cir.1976). *See also Matthews v. New York Life Insurance Co.,* 92 Idaho 372, 375, 443 P.2d 456, 459 (1968) (hearsay in supporting affidavit is inadmissible and insufficient to support a motion for summary judgment); I.R.C.P. 56(e).

*Nelson,* 1988 Opinion No. 36, 2–3.

The Idaho *Matthews* case cited in the footnote is unequivocal:

Appellant contends that certain portions of respondent's affidavits were inadmissible to show that agent Thueson had knowledge of Moore's failure to work 30 hours per week for the group policyholder. Respondent Matthews stated in his affidavit:

* * * That Duane Thueson knew that Rufus D. Moore was covered under the group policy and was not actively engaged in working directly for the corporation, but was an advisor, consultant, and officer for Peacock Beauty College and Salon. That Duane Thueson assured affiant that Rufus D. Moore was covered as a key man and officer and Duane Thueson had as much or more knowledge of the time which Rufus D. Moore devoted to Peacock Beauty College and Salon and other related corporations as did affiant. * * *

Certainly Matthews' statements as to the knowledge possessed by agent Thueson concerning Moore's status as an employee are conclusions on the part of respondent, and ordinarily inadmissible as hearsay. There is no showing herein that such statements were based on Matthews' personal knowledge, and therefore, such portion of Matthews' affidavit is insufficient to support a motion for summary judgment. *See Mercantile Nat. Bank at Dallas v. Franklin Life Ins. Co.,* 248 F.2d 57 (5th Cir.1957); *Hummell [Hummel] v. Wells Petroleum Co.,* 111 F.2d 883 (7th Cir.1940); *see also*

**416**

*Person v. United States,* 112 F.2d 1 (8th Cir.1940); I.R.C.P. 56(e).

*Matthews v. New York Life Ins. Co.,* 92 Idaho 372, 375, 443 P.2d 456, 459 (1968). Goddard's affidavit in Hebener's case is of exactly the same ilk as that of Matthews. The opinion in *Matthews* was unanimous.

Just two short years ago, Justice Bakes cited to *Matthews* in taking to task Justice Johnson's opinion in *Pearson v. Parsons,* 114 Idaho 334, 757 P.2d 197 (1988), which he did not join:

> I concur in the result reached by the majority opinion which concludes that the affidavits of Dr. Lindsay and Dr. Montgomery, filed on behalf of the defendants, were not adequate to support granting summary judgment for the defendants. However, I cannot concur in the majority's statement that 'the affidavit of Dr. Weeks was sufficient to raise a genuine issue of material fact and to defeat the motion for summary judgment of Dr. Parsons and Dr. Thueson.' *Ante* at 338, 757 P.2d at 201.
>
> Regarding the sufficiency of the affidavit of Dr. Weeks, I.R.C.P. 56(e) states, in pertinent part that '[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and *shall show affirmatively that the affiant is competent to testify to the matters stated therein.'* (Emphasis added.) Further, focusing to an even greater extent on the facts of this case I.C. § 6–1013 states that expert opinion testimony regarding a defendant's failure to meet the applicable standard of practice 'may *only* be admitted in evidence *if the foundation therefor is first laid,* establishing ... (c) that such expert witness possesses professional knowledge and expertise coupled with actual knowledge of the applicable said community standard....' (Emphasis added.)
>
> Both I.R.C.P. 56(e) and I.C. § 6–1013 require an adequate foundation regarding the expert's qualifications to be laid before he is permitted to testify as an expert by way of affidavit or otherwise. An adequate foundation is *not* laid, however, by the mere inclusion of conclusory

statements. Neither is an adequate foundation laid where an affidavit does not set out the requisite facts necessary to rule on any expert affiant's qualifications. In *Casey v. Highlands Ins. Co.,* 100 Idaho 505, 508, 600 P.2d 1387, 1390 (1979), this Court, in discussing a factually deficient and conclusory affidavit stated:

> Where an affidavit merely states conclusions and does not set out facts, such supporting affidavit is inadmissible to show the absence of a genuine issue of material fact. *Matthews v. New York Life Insurance Co.,* 92 Idaho 372, 443 P.2d 456 (1968). *Accord, Openshaw v. Allstate Insurance Co.,* 94 Idaho 192, 484 P.2d 1032 (1971).

A supporting affidavit is inadmissible to show the *presence* of a genuine issue of material fact if it merely states conclusions and does not set out the underlying facts. *See also Corbridge v. Clark Equip. Co.,* 112 Idaho 85, 87, 730 P.2d 1005, 1007 (1986) (affidavit not establishing specific facts "is precisely the type of flawed affidavit contemplated by I.R.C.P. 56(e)"); Wright, Miller & Kane, Federal Practice & Procedure: Civil (Second) § 2738 (1983) (ultimate or conclusory facts cannot be utilized on a summary judgment motion).

On point is *Nadler v. Baybank Merrimack Valley, N.A.,* 733 F.2d 182 (1st Cir.1984), *reh'g and reh'g en banc denied* 1984. In *Nadler,* defendant moved for summary judgment and supported its motion with, *inter alia,* an expert's deposition. Plaintiffs responded by offering the affidavit of Nadler, and her deposition. Summary judgment was granted, and the United States Court of Appeals, First Circuit, affirmed, stating that plaintiffs failed to adduce admissible evidence. It commented on Nadler's affidavit as follows:

> Nadler did not lack for self-confidence.... [However,] self-confidence is not enough. The liquidation business requires specialized knowledge as evidenced by ... the need for experts. She advanced, however, no single in-

stance of any personal connection with liquidation sales, either directly or indirectly.... "... [T]here must be some burden on her, and we cannot think unidentified, even 'extensive' experience in the furniture business enough to qualify her as an expert on the conduct of liquidation sales...." 733 F.2d at 184–185.

The court in *Nadler* concluded that, 'Plaintiffs having failed to adduce admissible evidence,' the judgment of the district court was affirmed. *Id.*

The affidavit of Dr. Weeks in the instant case closely parallels that proffered by Nadler; accordingly, we too should recognize the deficiencies in Dr. Weeks' affidavit and hold it inadmissible to withstand the instant motion for summary judgment.... [T]he affidavit of Dr. Weeks merely states *conclusions* as to his qualifications.... Nowhere does Dr. Weeks support these conclusory statements with underlying facts....

....

As Professors Wright, Miller and Kane have stated, 'Affidavits filed by a party in support of or in opposition to a motion for summary judgment must present evidence. The affidavits should allow substantially the same form as though the affiant were giving testimony in court.' Wright, Miller and Kane, Federal Practice & Procedure: Civil (Second) § 2738 (1983), *quoting Jameson v. Jameson,* 176 F.2d 58, 60 (D.C.Cir.1949).

*Pearson v. Parsons,* 114 Idaho at 339–42, 757 P.2d at 202–05 (emphasis in original and added, footnotes omitted). Although the instant case is not one for medical malpractice, one would think that Justice Bakes could remember what he so eloquently wrote just two years ago.

Justice Shepard's 1988 dissent in the instant case also was critical of the holding that there was enough evidence as to the existence of a fiduciary relationship between Hebener and Nelson: "No authority or rationale supports the majority's establishment of such a relation. The majority then establishes a breach of that fiduciary relationship by Nelson. No facts are cited

to establish such breach of fiduciary relationship. In my view the record before the trial court, and the record here, fails to establish any breach of any relationship and in fact clearly negates any breach of any duty." *Nelson,* 1988 Opinion No. 36, at 9. Justice Bakes subscribes to that view, worded slightly differently: "The trial court had before it no facts indicating the establishment of a 'fiduciary' relationship. Even assuming that such a relationship existed, there are no facts indicating a breach of such relationship...." At 411, 797 P.2d at 119. That statement is just as conclusory, and more so than the use of conclusory language of which he complained in his *Pearson v. Parsons* opinion. Additionally, in no way does his opinion explain why a fiduciary relationship did not exist at the time Nelson squired Mr. Hagadone to California with the quite apparent thought in mind that the restaurant which Nelson had designed and was promoting on behalf of Hebener, to be built on Hebener's property, could just as well become a Chart House restaurant located in or adjacent to Hagadone's magnificent project at Coeur d'Alene, Idaho.

Mr. Eismann will be very dismayed that neither Justice Shepard nor Justice Bakes gave any consideration to Hebener's brief, and in particular to Mr. Eismann's discussion of Judge Haman's concession that "arguably" Nelson may have breached a fiduciary duty to Hebener:

The court then took a strange turn in its reasoning process. It openly acknowledged that 'the plaintiff's conduct in this case may arguably have been *unethical* ... or he may arguably have *breached* a *fiduciary duty* to the defendant.' (Emphasis added) (R. p. 76) Had Judge Haman stopped at that point he would have been correct. The conduct *was* unethical and he *did* breach his fiduciary duty.

Judge Haman continued, however, and said that 'such conduct simply did not have anything to do with the defendant's loss of prospective advantage.' One is left with the overwhelming urge to reply—so what? Why does the conduct have to have anything to do with defen-

dant's loss of prospective advantage? No law anywhere holds that one can sue for breach of a fiduciary duty only if said breach causes loss of prospective advantage. Obviously, that is not a required element of said tort and no authority will be found to the contrary.

Furthermore, if the judge is of the opinion, and he obviously is, that Nelson may 'arguably' have breached a fiduciary duty to the defendant, why has Hebener not been given the benefit of having that construed in his favor, this being a Motion for Summary Judgment? That one finding alone is sufficient to preclude the court from granting a Summary Judgment to Nelson. In fact, Summary Judgment should more appropriately have been awarded to Hebener on that issue.

The District Judge clearly erred in requiring proof of loss of prospective advantage as an essential element of proving breach of a fiduciary duty. Loss of some prospective advantage might well be an element of damage in such a case, but then again it might not be. It is certainly not required. The judge again erred when he arbitrarily classified Hebener's action as one for loss of prospective advantage, totally ignoring that cause of action for breach of a fiduciary duty which was properly plead, argued in court, and even recognized by the trial judge.

Appellants' Brief, 21–22. Mr. Eismann, so it is feared, will also wonder why neither Justice Shepard nor Justice Bakes paid any attention to pages 12 through 18 of his appellants' brief, wherein the usually docile Mr. Eismann used very positive language, but evoked no comment in today's opinion for the Court:

The facts set forth in Hebener's affidavit, which are not materially contradicted, clearly establish the existence of the fiduciary relationship between Nelson and hebener (R. pp. 30–35).

In Hebener's affidavit the following facts are established:

(1) Hebener hired Nelson in 1979 to design a restaurant to be placed on Hebener's development in Coeur d'Alene and then to be leased back to Chart House.

(2) Hebener introduced Nelson to Chart House executives from whom he obtained information regarding various design concepts and knowledge of Chart House requirements and specifications.

(3) Nelson presented them with general site plans and preliminary restaurant concepts on behalf of Hebener.

(4) Chart House signed a Letter of Intent to lease said restaurant.

(5) Nelson traveled to California in March of 1982 to again make a presentation on behalf of Hebener.

(6) Nelson was at all times aware of the negotiations and continuing relationship between Hebener and Chart House and was kept fully advised as to the details of all negotiations which took place between them.

(7) Nelson knew no Chart House personnel until he was introduced to them by Hebener.

(8) Hebener received continuous billings from Nelson all referenced to the same job Number, C–CH–1, and numbered consecutively, 1 through 12, which bills covered services from June 15, 1981, through April 14, 1983, thus showing a continuous and ongoing business relationship between them (R., pp. 46–57).

(9) Said relationship continued until April 14, 1983, when Hebener discharged Nelson.

(10) Hebener relied upon the assumption that Nelson would not violate his position of trust and confidence.

(11) Nelson was a member of the American Institute of Architects during said time.

(12) Nelson acknowledged rendering continuous professional services to Hebener up to and including April 14, 1983.

The foregoing facts obviously establish the existence of a fiduciary relationship existing between Nelson and Hebener.

Having established the existence of such a relationship, the record must now be reviewed to determine whether or not Nelson violated his fiduciary duty, thus giving rise to a cause of action in Heben-

er for said violations. The answer seems obvious.

Nelson performed services for Hebener for approximately three years, all of which pertained to Hebener's dealings with Chart House. Nelson was trusted implicitly by Hebener and thus became privy to all negotiations between Hebener and Chart House. Through his relationship with Hebener he obtained a vast amount of knowledge concerning Chart House Restaurant specifications, requirements and policies. He was introduced to the inner circle of Chart House executives and discussed sensitive matters with them. He made presentations to Chart House personnel on behalf of Hebener. He, of course, picked up personal information relating to Hebener and became very familiar with the advantages and disadvantages of Hebener's property for a restaurant location. He became closely familiar with Hebener's future plans and timetables for completion thereof, and knew of Hebener's strengths and weaknesses regarding his ability to perform agreements being negotiated with Chart House.

Yet, in spite of the foregoing; in spite of the trust and confidence bestowed upon him; in spite of his fiduciary relationship with Hebener and duties arising therefrom; in spite of non-disclosure to Hebener; and even in spite of the ethical code of his own profession, he traveled to California with an individual who was Hebener's competitor, introduced him to Chart House executives, and attempted to gain Chart House's interest and approval in constructing a restaurant on said third party's property as opposed to Hebener's property. It would be hard to imagine a clearer case of obvious conflict, double-dealing and breach of the fiduciary duty.

Chart House had a continuing business relationship with Hebener from 1979 through September of 1983 (Goddard Depo. p. 9, lines 6–14). Nelson was fully aware of that relationship.

The testimony of Goddard, Executive Vice President of Chart House, shows just how flagrant Nelson's conduct was.

Between May of 1982 and September, 1983, (probably in May of 1982) Nelson arrived at the Chart House offices in California with Duane Hagadone, Coeur d'Alene businessman and direct competitor of Hebener. Goddard met with Hagadone and Nelson and related their conversation on pages 11 through 15 of his Deposition:

A. Mr. Hagadon (sic) was introducing to Chart House a piece of property that he, I think, owned downtown on the water.

Q. In Coeur d'Alene, Idaho?

A. In Coeur d'Alene, Idaho.

Q. What was he introducing that property for?

A. He was asking if Chart House would have interest in developing a Chart House on his piece of property.

Q. Was Mr. Nelson present when that conversation was taking place?

A. Yes.

Q. Did Mr. Nelson say anything?

A. I'm sure he did. It was a—probably an hour-ish meeting that looked at the piece of property in detail from aerials so it would be descriptive for me.

Q. Was Mr. Nelson assisting Mr. Hagadon in making this presentation to you?

A. We were all talking about it, so I guess, if that's assisting in making the presentation.

Q. *Did Mr. Nelson at any time during that hour-long or approximately hour-long meeting make any comments to you, Mr. Goddard, regarding the site of Mr. Hebener?*

A. *I'm sure that we were comparing Gary's site versus Duane Hagadon's site.*

Q. *Why were you comparing those two sites?*

A. *Because we were very interested in Gary's, and I would need to have known what the details on Mr. Hagadon's site was.*

Q. Obviously, would Chart House have been interested at all in putting in

two restaurants in Coeur d'Alene, Idaho?

A. No.

Q. Were Mr. Nelson and Mr. Hagadon attempting to sway you from the Hebener site towards Mr. Hagadon's new building?

A. *They* were introducing *their site;* which I'm sure Mr. Hagadon thought was superior to Gary's site.

Q. Well, we have Mr. Hagadon down here apparently indicating that his site would be nice as opposed, I suppose, to Hebener's site, and I'm wondering if Mr. Nelson at any time interjected any thoughts regarding the suitability or unsuitability of Hebener's site.

A. I don't think he spent any time defending Gary's site. I don't think there's a question that Mr. Hagadon's site is superior to Gary's site just from being downtown where we would get an exposure to tourism and traffic and being on the water downtown.

Q. During the meeting between you and Mr. Nelson and Mr. Hagadon, can you tell me whether or not Mr. Nelson made any comments regarding the sewer site up there as affecting Hebener's site?

A. I was aware of the sewer site, but it was also pointed out.

Q. By Mr. Nelson?

A. Uh-huh, probably. I can't remember.

Q. Did he point that out as being a plus or a minus for Mr. Hebener's site?

A. I can't imagine a sewer site being a plus for a restaurant site.

Q. Do you recall Mr. Nelson making any comments regarding Mr. Hebener's financial situation.

A. I don't know if I need to be—if you need to be more specific. I do know that it was pointed out that Duane Hagadon was substantial. He had a piece of property and had the financial capability to do it right now, and I don't think that it was done in demeaning Gary or pointing out the differences there. I think that that differ-

ences in locations and the developers was obvious to me.

Q. At the close of that meeting, Mr. Goddard, can you *tell me whether or not Mr. Nelson requested that you inform Mr. Hebener that the meeting had taken place?*

A. He might have said that, and I would have said, 'If Gary asked me, I will—I will tell him exactly what had taken place.'

Obviously, Nelson breached his position of trust and confidence. In fact, he obliterated it. The conflict that he created is unbelievable. He literally, and secretively, tried to sell his own client of almost three years duration down the river in favor of a much more opulent one. Not only did he fail to disclose this bit of treachery to Hebener, he even tried to hide the fact and hush it up.

Appellants' Brief, 12–18 (emphasis added).

Justice Bakes may be seen as inadvertently inflicting great injustice on Hebener by his misuse of *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 209 (1986), for the proposition that: "[T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Justice Bakes does accurately repeat that much of the language found in *Anderson,* however, he is not the only member of the Court who is aware of that case. Both Justice Johnson and I have quoted from it in our opinions in *Wiemer v. Rankin,* 117 Idaho 566, 790 P.2d 347 (1990). Justice Johnson's opinion, far more dramatically than mine, points out the fallacy of quoting from *Anderson*—out of context—as Justice Bakes has done. From Justice Johnson's *Wiemer* opinion:

## VI.

## THE EVIDENCE DID NOT RAISE A GENUINE ISSUE OF FACT THAT RANKIN HAD ACTUAL MALICE

The Supreme Court has announced the standard to be applied in ruling on a motion for summary judgment in a def-

amation case in which actual malice must be proved:

> When determining if a genuine factual issue as to actual malice exists in a libel suit ... a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times*. For example, there is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence.
>
> Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden. This conclusion is mandated by the nature of this determination. The question here is whether a jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of evidence required by the governing law *or* that he did not. Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant:
>
> It makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these standards and boundaries are in fact provided by the applicable evidentiary standards.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254–55, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202, 215–16 (1986) (emphasis in original).

*Wiemer v. Rankin*, 117 Idaho at 566, 790 P.2d at 356. Far worse, however, than the injustice done to Hebener is the havoc done to the trial bench and bar. Just exactly as noted by Justice Johnson, *Anderson* announced the standard which henceforth governs in one context only, and that is in the context of defamation cases. A much stricter standard will be applied in rulings on motions for summary judgment in defamation cases than the standard which applies in ordinary civil actions which are not predicated on defamation. Justice Johnson performed a service in bringing this new standard to everyone's attention. The High Court's opinion, Part IIA, opened with a statement of the issue. Unless Justice Bakes reconsiders, he will be setting as precedent a new standard which trial courts will be obliged to apply in *all* summary judgment proceedings, assuming that he garners a majority, which he does almost invariably. As of this moment there are only two members of the Court, Justice Johnson and myself, who are aware that the standard of *Anderson v. Liberty Lobby* applies only to defamation cases.

A final conclusion, after returning to the excerpts of Justice Bakes' opinion in *Pearson v. Parsons*, it is appropriate to approve, endorse, and repeat his conclusion in that case as one that would be a far more just and correct result than has been achieved: "[B]ecause the affidavits of Dr. Lindsay and Dr. Montgomery were also deficient for much the same reasons as was the affidavit of Dr. Weeks ... since all the affidavits were deficient, I would merely reverse and remand for further proceedings."[3] An even better result in the instant case would be that the entry of summary judgment in favor of Nelson be reversed, the parties sent off to trial.

---

**3.** *Pearson v. Parsons*, 114 Idaho at 342, 757 P.2d at 205 (Bakes, J. concurring in the result) (footnote omitted).